UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

----------------------------------------------------------- x

THOMAS SHINE,                                   :
                                                :          04 CV 8828 (MBM) (RLE)
                            Plaintiff,          :
                                                :
            - against -                         :
                                                :
DAVID M. CHILDS and SKIDMORE,                   :
OWINGS & MERRILL LLP,                           :
                                                :
                            Defendants.         :

----------------------------------------------------------- x

## DEFENDANTS' MEMORANDUM IN SUPPORT OF
## MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

**Page**

I.      FACTUAL BACKGROUND .................................................................................. 2

    A.      Shine 99 ................................................................................................ 3

    B.      Olympic Tower ..................................................................................... 3

    C.      The Evolution of Freedom Tower ......................................................... 5

    D.      The Design of Freedom Tower .............................................................. 7

    E.      Plaintiff's Copyright Registrations ....................................................... 8

II.     THE COURT MAY DISMISS PLAINTIFF'S CLAIM AT THIS STAGE OF
    THE PROCEEDINGS ..................................................................................... 10

III.    SHINE HAS NO COPYRIGHT PROTECTION FOR HIS PUTATIVE
    ARCHITECTURAL WORKS ......................................................................... 11

    A.      The Scope of Copyright in Architectural Works and Architectural
        Plans .................................................................................................... 11

        1.      Copyright Protection For Buildings Before 1991 ..................... 12

        2.      Copyright Protection for Architectural Drawings..................... 13

        3.      The Architectural Works Copyright Protection Act ................. 16

    B.      Shine Does Not Hold A Valid Copyright Interest of Any Kind in His
        Two Purported Works .......................................................................... 20

        1.      It is Unclear What Work or Works Shine is Attempting to
            Protect ....................................................................................... 22

        2.      Shine 99 and Olympic Tower are Not a Single Work ............... 23

        3.      Shine Cannot Combine His Materials for Shine 99 and
            Olympic Tower to Create a Single "Work"................................ 25

    C.      Neither Shine 99 Nor Olympic Tower Is an "Architectural Work" ..................... 26

        1.      Shine 99 is not an Architectural Work..................................... 27

        2.      Olympic Tower is not an Architectural Work .......................... 29

    D.      The Identifiable Elements of Olympic Tower are Either Unoriginal or

## TABLE OF CONTENTS
(continued)

**Page**

Functional or Both ................................................................... 31

E.     Even if Shine Can Claim Protection for His Selection, Coordination
       and Arrangement of These Otherwise Unprotected Elements, His
       Particular Choices are Either Unoriginal or Functional ........................................ 35

IV.    ASSUMING *ARGUENDO* SHINE'S WORKS ARE PROTECTIBLE, SOM
       DID NOT COPY THOSE WORKS ................................................................... 37

A.     The Various Tests for Analyzing Substantial Similarity ........................................ 39

B.     The *Altai* Test Is The Most Appropriate One For Architectural Works ............... 42

C.     Who Is The Proper Audience for Architectural Works? ........................................ 42

D.     The Court Can And Should Receive Expert Testimony to Aid in the
       Substantial Similarity Analysis of Architectural Works ........................................ 43

E.     Applying the *Altai* Test ................................................................... 44

       1.     Abstraction ................................................................... 45

       2.     Filtration ................................................................... 46

       3.     Comparison ................................................................... 47

              a.     The "Golden Nugget" of Olympic Tower ..................................... 48

              b.     The Higher Level of Articulation of Freedom Tower
                     Shows Additional Dissimilarities ................................................. 50

F.     Applying the Statutory Definition/Compilation Theory ........................................ 52

G.     Applying the Total Concept and Feel Test ........................................................... 53

CONCLUSION ................................................................................................... 57

## TABLE OF AUTHORITIES

<u>Page</u>

*Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.,*
  205 F.3d 137 (4th Cir. 2000) ............................................................... 34, 49

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ............................................................................ 10

*Arnstein v. Porter,*
  154 F.2d 464 (2d Cir. 1946) ................................................................ 40

*Arthur Rutenberg Homes, Inc. v. Maloney,*
  891 F. Supp. 1560 (M.D. Fla. 1995) .................................................... 15

*Atari, Inc. v. Amusement World, Inc.,*
  547 F. Supp. 222 (D. Md. 1981) .......................................................... 53

*Attia v. Society of the New York Hosp.,*
  201 F.3d 50 (2d Cir. 1999) ........................................................... passim

*Baker v. Selden,*
  101 U.S. 99 (1879) .............................................................................. 12

*Bell v. Blaze Magazine,*
  No. 99 Civ. 12342, 2001 U.S. Dist. LEXIS 2783,
  (S.D.N.Y. Mar. 16, 2001) (Casey, J.) ................................................. 10

*Bonner v. Dawson,*
  *2003 U.S. Dist. LEXIS 19069 (W.D. W. Va. Oct. 14, 2003)* ................... 39

*Boisson v. Banian, LTD.,*
  273 F.3d 262 (2d Cir. 2001) ................................................................ 54

*Broderbund Software v. Unison World Inc.,*
  648 F. Supp. 1127 (N.D. Cal. 1986) .................................................... 53

*Buckman v. Citicorp,*
  No. 95 Civ. 0773, 1996 U.S. Dist. LEXIS 891
  (S.D.N.Y. Jan. 30, 1996) (Mukasey, J.). ............................................. 10

*Carol Barnhart Inc. v. Economy Cover Corp.,*
  773 F.2d 411 (2d Cir. 1985) ................................................................ 38

*Castle Rock Entm't v. Carol Publ'g Group, Inc.,*
  150 F.3d 132 (2d Cir. 1998) ......................................................... passim

## TABLE OF AUTHORITIES
(continued)

**Page**

*CBS Broad., Inc. v. ABC, Inc.,*
02 Civ. 8813, 2003 U.S. Dist. LEXIS 20258
(S.D.N.Y. Jan. 14, 2003) (Preska, J.)............................................................... 36, 37, 54

*Chambers v. Time Warner, Inc.,*
282 F.3d 147 (2d Cir. 2002) ............................................................................. 10

*CK Co. v. Burger King Corporation,*
No. 92 Civ. 1488, 1994 WL 533253
(S.D.N.Y. Sept. 30, 1994) (Haight, J.)............................................................. 25, 55

*Computer Assocs. Intern, Inc. v. Altai, Inc.*
982 F.2d 693 (2d Cir. 1992).............................................................................. passim

*Cornerstone Home Builders, Inc. v. N. McAllister,*
*303 F. Supp. 1317 (M.D. Fla. 2004)*................................................................. *39*

*Craig v. Dabrowski,*
No. 98 Civ. 405, 1999 U.S. Dist. LEXIS 9063 (N.D. Ill. June 8, 1999) ................... 20

*CSM Investors, Inc. v. Everest Dev. Ltd.,*
840 F. Supp. 1304  (D. Minn. 1994)................................................................. 15

*Dawson v. Hinshaw Music, Inc.,*
905 F.2d 731 (4th Cir. 1990) ........................................................................... 42, 43

*Dellar v. Samuel Goldwyn, Inc.,*
150 F.2d 612 (2d Cir. 1945).............................................................................. 1

*Demetriades v. Kaufmann,*
680 F. Supp. 658 (S.D.N.Y. 1988) (Goettel, J.)................................................ 13, 14

*Deravin v. Kerik,*
335 F.3d 195 (2d Cir. 2003).............................................................................. 10

*Durham Indus., Inc. v. Tomy Corp.,*
630 F.2d. 905 (2d Cir. 1980)............................................................................. 47

*Eales v. Envtl. Lifestyles, Inc.,*
958 F.2d 876 (9th Cir. 1992) ............................................................................ 15

*Eden Toys, Inc. v. Marshall Field & Co.,*
675 F.2d 498 (2d Cir. 1982).............................................................................. 54

## TABLE OF AUTHORITIES
(continued)

**Page**

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,*
  499 U.S. 340 (1991)......................................................................................... passim

*Folio Impressions, Inc. v. Byer California,*
  937 F.2d 759 (2d Cir. 1991)...................................................................... 41

*Fonar Corp. v. Domenick,*
  105 F.3d 99 (2d Cir. 1997)......................................................................... 21

*Gentieu v. Tony Stoneimages/Chicago, Inc.,*
  255 F. Supp. 2d 838 (N.D. Ill. 2003) ................................................... 44

*Geritrex Corporation v. Dermarite Indus.,*
  910 F. Supp. 955 (S.D.N.Y. 1996)........................................................ 29

*Green v. Lindsey,*
  885 F. Supp. 469 (S.D.N.Y. 1992) (Mukasey, J.)......................... 37

*Hamil Am., Inc., v. GFI,*
  193 F.3d 92 (2d Cir. 1999).......................................................................... 54

*Horgan v. Macmillan,*
  789 F.2d 157 (2d Cir. 1986)...................................................................... 40

*Howard v. Sterchi,*
  974 F.2d 1272 (11th Cir. 1992) ........................................................ 47, 49

*Hunt v. Pasternack,*
  192 F.3d 877 (9th Cir. 1999) ............................................................. 15, 17

*Imperial Homes Corp. v. Lamont,*
  458 F.2d 895 (5th Cir. 1972) ............................................................. 13, 14

*Jones Bros. Co. v. Underkoffler,*
  16 F. Supp. 729 (M.D. Pa. 1936).............................................................. 13

*Kaplan v. Stock Mkt. Photo Agency, Inc.,*
  133 F. Supp. 2d 317 (S.D.N.Y. 2001) (Schwartz, J.) ................... 11, 31

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Kieselstein-Cord v. Accessories By Pearl, Inc.,*
  632 F.2d 989  (2d Cir. 1980)..................................................................... 38

*Kitchens of Sara Lee, Inc. v. Nifty Foods Corp.,*
  266 F.2d 541 (2d Cir. 1959)...................................................................... 28

*Knitwaves, Inc. v. Lollytogs LTD. (Inc.),*
  71 F.3d 996 (2d Cir. 1995)........................................................................ 54

*Kohus v. John v. Mariol,*
  328 F.3d 848 (6th Cir. 2003) ..................................................................... 43

*Kootenia Homes, Inc. v. Reliable Home, Inc.*
  Civ. No. 00-1117, 2002 U.S. Dist. LEXIS 235 (D. Minn. Jan. 3, 2002)............................ passim

*Kregos v. Associated Press,*
  3 F.3d 656 (2d Cir. 1993)........................................................................ 11

*Kroencke v. General Motors Corp.,*
  270 F. Supp. 2d 441 (S.D.N.Y. 2003) (Rakoff, J.), .................................................. 26

*Lajoie v. Pavcon, Inc.,*
  146 F. Supp. 2d 1240 (M.D. Fla. 2000)......................................................... 51

*Lamps Plus, Inc. v. Seattle Lighting Fixture Co.,*
  345 F.3d 1140 (9th Cir. 2003) ................................................................... 35

*Laureyssens v. Idea Group, Inc.,*
  964 F.2d 131 (2d Cir. 1992); ................................................................ 41, 42

*Leibovitz v. Paramount Pictures Corp.,*
  137 F.3d 109  (2d Cir. 1998)..................................................................... 31

*Leicester v. Warner Bros.,*
  232 F.3d 1212 (9th Cir. 2000) ........................................................ 11, 12, 13

*Morrissey v. Procter & Gamble Co.,*
  379 F.2d 675 (D. Mass. 1967) ................................................................... 28

*Muller v. Triborough Bridge Auth.,*
  43 F. Supp. 298 (S.D.N.Y. 1942) (Leibell, J.)................................................... 14

*MyWebGrocer, LLC v. Hometown Info, Inc.,*
  375 F.3d 190 (2d Cir. 2004)..................................................................... 28

## TABLE OF AUTHORITIES
(continued)

**Page**

*National Medical Care, Inc. v. Espiritu,*
   284 F. Supp. 2d 424 (S.D. W. Va. 2003) ....................................................... 17, 43, 53

*Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.,*
   166 F.3d 65  (2d Cir. 1999) ........................................................................................ 40

*Novak v. NBC,*
   716 F. Supp. 745, 752 (S.D.N.Y. 1989) (Sweet, J.) .................................................... 42

*Odegard Inc. v. Costikyan Classic Carpets,*
   963 F. Supp. 1328 (S.D.N.Y 1997) (Koeltl, J.) ........................................................... 21

*Oneida Indian Nation of New York v. City of Sherrill,*
   337 F.3d 139 (2d Cir. 2003) ........................................................................................ 10

*Original Appalachian Artworks, Inc. v. Toy Loft,*
   684 F.2d 821 (11th Cir. 1982) .................................................................................... 47

*Polsby v. St. Martin's Press, Inc.,*
   1999 U.S. Dist. LEXIS 5416 (S.D.N.Y. Apr. 19, 1999) (Mukasey, J.) ...................... 10

*Pristine Indus. v. Hallmark Cards,*
   753 F. Supp 140 (S.D.N.Y. 1990) (Sweet, J.) ............................................................. 29

*Repp & K & R Music, Inc. v. Webber,*
   132 F.3d 882 (2d Cir. 1997) ........................................................................................ 37

*Reyher v. Children's Television Workshop,*
   533 F.2d 87 (2d Cir. 1976) .................................................................................... 25, 54

*Richard J. Zitz, Inc. v. Curran,*
   97 cv 0576, 1998 U.S. Dist. LEXIS 23142, * (E.D.N.Y. Nov. 9, 1998) .................... 23

*Richard J. Zitz, Inc. v. Pereira,*
   119 F. Supp. 2d 133 (E.D.N.Y. 1999) (Boyle, J.) ...................................................... 23

*Richard J. Zitz, Inc. v. Pereira,*
   No. 99-9399, 2000 U.S. App. LEXIS 22418 (2d Cir. Aug. 31, 2000). ...................... 37

*Robert R. Jones Assocs., Inc. v. Nino Homes,*
   858 F.2d 274 (6th Cir. 1988) ...................................................................................... 14

## TABLE OF AUTHORITIES
(continued)

**Page**

*Robinson v Viacom Int'l, Inc.,*
No. 93 Civ. 2539, 1995 WL 417076 (S.D.N.Y. July 13, 1995) (Patterson, J.) .................. 25, 26

*Rogers v. Koons,*
960 F.2d 301  (2d Cir. 1992)......................................................................................... 31

*Satava v. Lowry,*
323 F.3d 805 (9th Cir. 2003) ......................................................................................... 35

*Sheldon v. Metro-Goldwyn Pictures Corp.,*
81 F.2d 49 (2d Cir. 1936).......................................................................................... 40, 56

*Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.,*
562 F.2d 1157 (9th Cir. 1977) ................................................................................... 40, 53

*Sparaco v. Lawler, Matusky, Skelly Eng'rs,*
303 F.3d 460 (2d Cir. 2002).................................................................................... passim

*Stephen Hayes Constr., Inc. v. Meadowbrook Homes, Inc.,*
988 F. Supp. 1194 (N.D. Ill. 1998) ............................................................................... 20

*Streetwise Maps, Inc. v. Vandam, Inc.,*
159 F.3d 739 (2d Cir. 1998)........................................................................................... 54

*Sturdza v. United Arab Emirates,*
281 F.3d 1287 (D.D.C. 2002) ................................................................................... 44, 55

*Susan Wakeen Dalco v. Ashton-Drake Galleries,*
272 F.3d 441 (7th Cir. 2001) ......................................................................................... 44

*The Procter & Gamble Co. v. Colgate-Palmolive Co.,*
96 Civ. 9123, 1998 U.S. Dist. LEXIS 17773
(S.D.N.Y. Nov. 9, 1998) (Patterson, J.)................................................................ 11, 20, 55

*The Rottlund Co. v. Pinnacle Corp.,*
Civ. No. 96-30165, 2004 U.S. Dist. LEXIS 16723
(D. Minn. Aug. 20, 2004) ............................................................................................... 16

*The Yankee Candle Co., Inc. v. New England Candle Co., Inc.,*
Civ. No. 96-30165, 1997 U.S. Dist. LEXIS 23099
(D. Mass. June 26, 1997) ............................................................................................... 17

*Three Boys Music Corp. v. Michael Bolton,*
212 F.3d 477 (9th Cir. 1999) ......................................................................................... 53

# TABLE OF AUTHORITIES
(continued)

*Tienshan, Inc. v. C.C.A. Int'l, Inc.,*
  895 F. Supp. 651 (S.D.N.Y. 1995) (Stein, J.) ............................................................. 42

*Tompkins Graphics, Inc. v. Zipatone, Inc.,*
  Civil Action 82-5438, 1983 WL 398 (E.D. Pa. Aug. 15, 1983) ................................. 28

*Torah Soft v. Drosnin,*
  136 F. Supp. 2d 276 (S.D.N.Y. 2001) (Scheindlin, J.) .............................................. 21

*T-Peq, Inc. v. Isbitski,*
  Civ. No. 03-462, 2005 U.S. Dist. LEXIS 2474 (D.N.H. Feb. 9, 2005) ..................... 22

*Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.,*
  338 F.3d 127 (2d Cir. 2003)................................................................................. 54, 55

*Twentieth Century-Fox Film Corp. v. MCA, Inc.,*
  715 F.2d 1327 (9th Cir. 1983) .................................................................................. 40

*Walker v. Time Life Films, Inc.,*
  784 F.2d 44 (2d Cir. 1986)................................................................................... 11, 54

*Walter Sedovic Architect, P.C. v. Alesandro,*
  98 Civ. 2120, 1999 U.S. Dist. LEXIS 17443
  (S.D.N.Y. Nov. 2, 1999) (Jones, J.)........................................................................... 51

*Warner Bros., Inc. v. American Broad. Co.,*
  654 F.2d 204 (2d Cir. 1981)....................................................................................... 29

*Warner Bros., Inc. v. American Broad. Co.,*
  720 F.2d 231 (2d Cir. 1983)......................................................................... 11, 47, 56

*Wellmade Toy Mfg. Corp. v. Gotta Int'l,*
  354 F. 3d 112 (2d Cir. 2003)................................................................................ 23, 25

*Wickham v. Knoxville Int'l Energy Exposition, Inc.,*
  739 F.2d 1094 (6th Cir. 1984) .................................................................................. 52

*William S. Geiger Corp. v. Gigi Assocs., Inc.,*
  1997 WL 458668 (S.D.N.Y. Aug. 11, 1997) (Martin, J.)........................................... 28

*Williams v. Broadus,*
  99 Civ. 10957, 2001 U.S. Dist. LEXIS 12894
  (S.D.N.Y. Aug. 27, 2001) (Mukasey, J.) ................................................................... 21

# TABLE OF AUTHORITIES
(continued)

**Page**

*Williams v. Crichton,*
  860 F. Supp. 158 (S.D.N.Y. 1994) (McKenna, J.)........................................................ 25

*Williams v. Crichton,*
  84 F.3d 581 (2d Cir. 1996)........................................................................................... 54

*Willis v. Home Box Office,*
  No. 00 Civ. 2500, 2001 WL 1352916
  (S.D.N.Y. Nov. 2, 2001) (Martin, J.) .......................................................................... 25

*Yurman Design, Inc. v. PAJ, Inc.,*
  262 F.3d 101 (2d Cir. 2001) ........................................................................................ 54

## STATUTES

37 C.F.R. § 202.11 (1995) ................................................................. 18, 19, 21, 23, 27

17 U.S.C. § 5........................................................................................................... 13

17 U.S.C. § 101 .............................................................................................. passim

17 U.S.C. § 102...................................................................................................... 56

17 U.S.C. § 113...................................................................................................... 14

## LEGISLATIVE HISTORY

Senate Report on the Berne Convention Implementation Act of 1988 (1988)............................ 13

H.R. Rep. 101-735 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6935 ............................ 16, 17, 18, 32

*Architectural Works Copyright Protection Act of 1990 and Unique
  Architectural Structures Copyright Act of 1990: Hearings on H.R.
  3990 and H.R. 3991 Before The Subcommittee on Courts,
  Intellectual Property, and the Administration of Justice,* 101st Cong. 192 (1990) ....... 12, 17, 19

## TREATISES

Melville B. Nimmer & David Nimmer,
  *Nimmer on Copyright* (2004) ............................................................................. passim

## TABLE OF AUTHORITIES
(continued)

**Page**

### CIRCULARS

Circular 41, Copyright Claims in Architectural Works (2003), *available* at
  www.copyright.gov/circs/circ41.pdf ......................................................................................... 19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

------------------------------------------------------------- x

THOMAS SHINE,                                         :
                                                      :        04 CV 8828 (MBM) (RLE)
                         Plaintiff,                   :
                                                      :
          - against -                                 :
                                                      :
DAVID M. CHILDS and SKIDMORE,                         :
OWINGS & MERRILL LLP,                                 :
                                                      :
                         Defendants.                  :
------------------------------------------------------------- x

### DEFENDANTS' MEMORANDUM IN SUPPORT OF
### MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT

This memorandum of law is submitted by defendants David M. Childs and Skidmore, Owings &

Merrill LLP (collectively, "SOM"), by their undersigned attorneys, Flemming, Zulack & Williamson,

LLP and Davis Wright Tremaine LLP, in support of their motion to dismiss on the pleadings pursuant to

Fed.R.Civ.P., Rule 12(c), and/or for summary judgment for defendants pursuant to Fed.R.Civ.P., Rule 56,

and for an award of prevailing party attorneys' fees under 17 U.S.C. § 505 in their favor.

> **[T]his action as a whole has been built up, partly upon a wholly**
> **erroneous understanding of the extent of copyright protection; and**
> **partly upon that obsessive conviction, so frequent among authors**
> **and composers, that all similarities between their works and any**
> **others which appear later must inevitably be ascribed to plagiarism.**
> ***Dellar v. Samuel Goldwyn, Inc.*, 150 F.2d 612, 613 (2d Cir. 1945).**

That obsessive conviction is apparently shared by at least one architect plaintiff Thomas Shine ("Shine"),

who believes that David Childs' design for Freedom Tower – the symbolic skyscraper to be erected on

the site of the World Trade Center – infringes his putative copyright interest in a series of rudimentary

models and designs which Shine prepared while a student at The Yale University School of Architecture

("Yale"). Shine's student efforts were quite good as Childs himself commented when he was asked to

participate in a "jury" at the end of Shine's course. Shine posits that Childs saw his student project, liked

it, and therefore copied it in designing Freedom Tower several years later.

Granted, there are similarities between the collection of drawings and models that Shine claims he created on the one hand and Freedom Tower on the other. But those similarities derive solely from the fact that each is – or purports to be – a modernist skyscraper, constructed of steel with some visual warping and a textured glass skin. Even assuming that it is permissible to take the collection of models and drawings on which Shine predicates his two copyright registrations and amalgamate them, they still would not constitute an "architectural work" as that term is defined in the Copyright Act and for that reason alone, the complaint must be dismissed. And even assuming that Shine could somehow obtain copyright protection for his collection of models and drawings, Freedom Tower has nothing in common with them, save for ideas and common stock elements. As a matter of law, there is no substantial similarity here under any of the applicable tests articulated in this Circuit. As explained below and in the accompanying Affidavits of Richard Meier and John P. Durschinger each sworn to March 25, 2005 ("Meier Aff't" and "Durschinger Aff't", respectively), defendants are therefore entitled to dismissal of the complaint and an award of prevailing party attorneys fees.

## I.

### FACTUAL BACKGROUND

According to the complaint, Shine was a Yale student in 1999 and as part of his required curriculum, he took an advanced studio about skyscrapers taught by the well-know architect Cesar Pelli. Comp., ¶¶ 1-8. That semester, he apparently produced what he concedes are two separate designs for the project Pelli assigned the class, *i.e.*, formulating a design proposal for a skyscraper for the 2012 Olympic Games. Comp., ¶¶ 8-12. Shine alleges, and it is the fact, that Childs was on the "jury" that briefly reviewed and commented on the students' works at the end of the semester in December of that year. Comp., ¶ 11. Childs liked Shine's efforts and said so, as reported in the 1999-2000 issue of Yale's student magazine *Retrospecta*. Comp., ¶ 12 Ex. C.

## A.    Shine 99

Shine labels the first of his two designs "Shine 99"; it is reflected in a series of pictures of a simple model annexed to the complaint as Exhibit A.[1]  The complaint describes this maquette as "having two straight, parallel, roughly triangular sides, connected by two twisting" sides. Comp., ¶ 9. The model, approximately 10 inches tall, is constructed of thin, lightweight wood, has a square base and a parallelogram on top.  It has four generally vertical sides, two of which are warped.  Durschinger Aff't, ¶ 8.   The two straight sides taper towards the top, are smooth, and have no additional distinguishing features.  The two warped sides are slightly broader at the top then they are at the bottom.  One side has four distinct "setbacks" or steps in it.  None of the sides has any surface texture or pattern.  The top of the maquette is flat and horizontal.   There is no indication of floor levels, perimeter structure, window mullions and glazing, entrance, or central service and structural core on the maquette.  Nor is there any indication of scale for the maquette. Durschinger Aff't, ¶¶ 9-12; Ex. E.

## B.    Olympic Tower

According to the complaint, around October 15, 1999, Shine began to design models for his second design, *i.e.*, "his concept of a twisting tower with a twisting exterior structural grid and a textured facade". Comp., ¶ 10. The materials annexed to the complaint as Exhibit B purport to be drawings and photographs of the various models Shine says constitute this work.  The photographs differ in certain critical respects from the actual models they depict.  Likewise, the photographs also differ somewhat from the materials Shine annexed to his copyright application for Olympic Tower, copies of which are annexed to the Durschinger Aff't, Ex. L.  Annexed to the complaint are a "photomontage" of a model (Model No. 1), purportedly reflecting the curtain wall or outer skin that Shine designed (the "Picture"); three models or "maquettes" which differ one to the other (Model Nos. 2, 3, and 4); and three drawings (Drawing Nos. 1, 2 and 3).  The specifics of each of these exhibits are detailed in the accompanying Durschinger Aff't

---

[1]       In fact, Exhibit A is highly misleading as visual examination of the model itself reveals: it does not accurately reflect the model of Shine 99.  Defendants have taken their own objective photographs, which are annexed to the Durschinger Aff't, Ex. E.

and far more accurate representations of the models are reflected in the photographs of them annexed to the Durschinger Aff't as Exs. F - I.

In short, the "photomontage" -- essentially a manipulated picture made by assembling pieces of photographs depicts Model No. 1. Durschinger Aff't, Ex. E. The model is constructed of paper, wood and translucent plastic, approximately 16" high by 6" wide, and reflects a diamond-like pattern which creates a "weaving" impression: The adjacent diamond-like shapes do not touch and the diagonal bars which form the diamonds do not intersect. The base of all the triangle-like shapes are parallel, so the overall form of the model is flat, not warped or twisted. Durschinger Aff't, ¶¶ 15-16.

Model No. 2 (Durschinger Aff't, Ex. G) is a maquette approximately 31" tall, constructed of paper and museum board with a square base, a rectangular top rotated approximately 90 degrees relative to that base, four other sides all of which twist at approximately the same angle. At the base of the twisted sides, there are several cowl-like shapes. Three of the four twisted sides are covered with paper folded to form small interlocking triangles which rise and fall creating a weaving impression. On the fourth, interlocking triangles appear to have been drawn in pencil. Each pair of triangles forms a diamond-like shape which abuts the edges of the sides on which it appears. The number of diamond-like shapes across the twisted side of the maquette varies. There is no indication of floor level, perimeter structure, window mullions and glazing, or central service and structural core on this maquette. Durschinger Aff't, ¶¶ 18-20.

Model No. 3 (Durschinger Aff't, Ex. H) is 38" inches tall and is constructed of paper, cardboard and wood. It has two vertical masts supporting ten flat and evenly spaced and horizontal cardboard plates. The lowest plate is a square and the plates diminish in size and change in shape moving up the maquette, culminating in a rectangular plate. They rotate at even increments over the height of the model, so that the uppermost plate is approximately 90 degrees relative to the lowest plate. Two sets of diagonal rods overlap the plates so as to form a diagonal grid pattern, known in architecture as a "diagrid". These diamond-like shapes twist or "torque" at about 90 degrees over the height of the model and are

significantly set in from the corners of the maquette. This model has no indication of window mullions or glazing, and has no indication of scale. Durschinger Aff't, ¶ 21. Model No. 4 (*id.*, Ex. I) differs from Model No. 3 in that the vertical masts do not project above the top; the diagonal wood rods are affixed to four sides of the maquette rather than one; and on two sides the grid is approximately equal in width throughout, while on the other two, the pattern diminishes in width from top to bottom. *Id.* ¶ 23.

Shine also submits three drawings (Comp., Ex. B, pp. 7-9). Drawing No. 1 is presumably a set of floor plans showing the location for structural columns at the perimeter and a central core. The bottom floor plan is a square; each successive plan from bottom to top diminishes in size and rotates counterclockwise, so that the top plan is a rectangle approximately one half the size of the bottom plan, at a 90 degree angle to it. The sixth and seventh plans appear to be the same size and rotate the same amount, in contrast to the others which reflect a regular pattern of change in size and rotation. Durschinger Aff't, ¶ 25. Drawing No. 2 shows four diagrams each of which has ten superimposed rectangles that diminish in size and rotate. *Id.*, ¶ 25. Drawing No. 3 is a sketch of a repeating pattern of alternating triangles created by superimposing a diagonal grid pattern over nine horizontal lines; some of the triangles are shaded to create the impression of a larger diamond pattern running horizontally across the sketch. None of these three drawings have any indication of scale or orientation. *Id.*, ¶ 27.

The above described materials are annexed to plaintiff's complaint. Since the filing of that complaint, defendants' counsel has been shown four additional models of indeterminate origin and time; each of these four models is similar, in some but not all respects, to the models described above, as detailed in the Durschinger Aff't at ¶¶ 28-30.

### C.    The Evolution of Freedom Tower

The events of September 11, 2001 need no recounting. As has been well documented in the press and numerous books, almost immediately after the fall of the World Trade Center ("WTC") Twin Towers, public interest in the design of buildings to replace them was intense. Throughout 2002 and 2003, many schemes for the WTC site, both "official" and "unofficial", were proposed by well-known architectural firms and individual architects and engineers. Some of the "unofficial" schemes were

generated or commissioned by the press, most notably by *New York Magazine* and *New York Times Magazine*; others were independently submitted by architects, designers and other interested persons to various government agencies and media outlets. When the original "official" proposals for the site were poorly received by the public in July 2002, the Lower Manhattan Development Corporation (the "LMDC") and Port Authority of New York and New Jersey (the "Port Authority") selected seven teams of architects and urban planners to participate in a design competition for a master site plan; in February 2003, Studio Daniel Libeskind ("Libeskind") was selected as the master site planner based on its master plan concept design entitled "Memory Foundations". *See, Suzanne Stevens, Imagining Ground Zero: Official & Unofficial Proposals for the World Trade Center Site*, 26-35, 61 (Rizzoli International Publications, Inc. 2004) ("Imagining Ground Zero").

Before Libeskind was finally selected as the master site planner, Larry Silverstein, a developer affiliated with the entities that hold the long-term leases for the WTC commercial space, had asked David Childs and SOM to develop plans for the WTC site, and Childs and SOM had begun working on conceptual designs for a tower for an area of the site near Church Street. Imagining Ground Zero at 103 (A design team led by Roger Duffy of SOM, which included design professionals from several other firms and countries, also had submitted a scheme for the LMDC/Port Authority design competition.) Imagining Ground Zero at 86-87 After Libeskind's scheme was selected, Silverstein asked Childs and SOM to begin working on a design for the tallest building in the Libeskind plan designated for an area of the site located on West Street between Fulton Street and Vesey Street. In the summer of 2003, Childs and countless others at SOM, in collaboration with the structural engineer Guy Nordenson of Guy Nordenson & Associates, LLP along with many other consultants, began working on a conceptual design for what later came to be known as the "Freedom Tower." (In September 2002, Nordenson had presented a design for a torqued tower for the WTC site published in the *New York Times Magazine*, for which several precedents were acknowledged, including works of Frank Gehry and Isamu Noguchi, among others, as well as a conceptual design presented in the immediate aftermath of September 11 by architect

Richard Dattner for two linked, twisting towers. *See* Meier Aff't, Exhibit 6-18); Imagining Ground Zero at 31-35, 199 Herbert Muschamp, *Don't Rebuild. Reimagine*, New York Times Magazine, Sep. 8, 2002.

In July 2003, Silverstein retained Libeskind as "collaborating architect" for the concept and schematic design phases of Freedom Tower; on December 19, 2003, after months of work and intense negotiations between SOM and Libeskind concerning their competing visions, Governor George Pataki unveiled the plan for the Freedom Tower at a press conference at Federal Hall National Memorial in lower Manhattan.

### D.     The Design of Freedom Tower

What was publicly displayed by SOM and Childs on December 19, 2003 and what is apparently alleged to infringe Shine's works[2] consisted of six large computer generated images that presented various views of Freedom Tower, as well as a roof plan, site plan, and six typical floor plans; two scale models one small and one eight feet high and quite detailed; a computer slide show presented by Childs consisting of 28 slides and describing the development of the form of the Freedom Tower, the accommodation of environmental and master plan conditions, the major structural components of the building, the major building safety features incorporated into the design, and the design principles underlying the new Freedom Tower; and a press release packet that contained six images of the proposed towers. Durschinger Aff't, ¶¶ 34-41; Ex. N-R.

The smaller of the two scale models of Freedom Tower is built of wood and plexiglass (its scale is 1 inch equals 100 feet). It was presented in context, namely showing its location and orientation in relation to the World Trade Center site, the immediate neighborhood, and New York City. In context, the size of the proposed Freedom Tower in relation to the surrounding buildings, as well as its overall shape and form, are visible. The display reveals major functional and symbolic elements of the building

---

[2]     Throughout, we use the term "Shine's works" for convenience only; as demonstrated herein, they are not "works of authorship" or "architectural works" under Copyright Act. Likewise, we employ the word "design" and "building" in reference to Shine's material, without waiver of the technical argument that "Shine's works" are not the "design of a building".

including the lobby, commercial office space, restaurant, event space, observation platform, wind turbines, transmission facility and offset building spire. Durschinger Aff't, ¶ 36, Ex. N.

The larger model, (which is over eight feet tall) provides even more detail of the architectural design of the building itself as detailed in Durschinger Aff't, ¶¶ 38-39; and Exs. O and P thereto. In this model, all of the 71 horizontal floor plates save for one are parallelograms. The north and south sides of the parallelogram floor plates do not rotate or change orientation. This means that the north and south faces of the model are flat, not warped. All four vertical faces have diagrids, each spanning fifteen floors. There are ten diamond shapes across the east and west warped surfaces, and twelve diamond shapes across and fourteen from bottom to top. Diamond shapes on the east and west warped faces have triangular planes that project outward from the model creating a distinct pyramidal form. At the base of the model, alternating diamond shapes are left open and the inner wall is set in, creating an open arcade. Building entrances are depicted on three sides of the arcade. Atop the enclosed portion of the model, the walls are set in and the roof slopes; two circular vertical structural masts extend above it providing support for 25 wind-powered electricity generating turbines. These masts are braced by a cable and truss structure and capped by an off center building spire - the echo of the Statue of Liberty which Libeskind had envisioned. Durschinger Aff't, Ex. O.

A vast number of other materials with respect to the working design of Freedom Tower had been prepared by SOM prior to December 19, 2003, which were not properly displayed on that date. Those materials revealed many additional details about the design of Freedom Tower as of that date. Durschinger Aff't, ¶ 42, Ex. S. Among those materials were preliminary design of a central service and central core including: elevators, egress stairs, mechanical and telecommunication spaces, toilets and building structure; preliminary building structure design; preliminary building mechanical design; and preliminary site design, including integration with other WTC site facilities. Durschinger Aff't, ¶ 42.

### E.    Plaintiff's Copyright Registrations

Apparently sometime after the Governor's press conference, Shine decided that Childs's work was an infringing copy of his student project. He therefore filed for a copyright protection for a collection

of materials described above and identified by Shine as "scale model of architectural work", entitled Olympic Tower on March 30, 2004. Comp., Ex. E. Sometime thereafter, he filed a separate copyright application to register Shine 99 as a "scale model of architectural work". Shine's deposit copies for Shine 99 consist of 11 photographs of what appears to be the same 10 inch model depicted in Exhibit A to his complaint. Durschinger Aff't, ¶ 32; Ex. M. The copyright deposit photographs are slightly smaller and sharper than any of the photographs attached to the complaint and include images of the setbacks from a different camera angle. *Id.* For "Olympic Tower", Shine deposited 12 images but he did not include any photographs of Model No. 1 or Model No. 4. Durschinger Aff't, ¶ 33, Ex. L.

Registrations in hand, Shine commenced this action on or about November 8, 2004 by filing of the summons and complaint; A copy of the comp complaint is annexed to the Durschinger Aff't as Exhibit A. Thereafter, SOM and Childs each answered, joining issue (*id.*, Ex. C, D), and advised the Court that they intended to file the instant motion.

## II.

### THE COURT MAY DISMISS PLAINTIFF'S CLAIM
### AT THIS STAGE OF THE PROCEEDINGS

Under Fed.R.Civ.P. 12(c), a court should dismiss if, accepting all allegations in the complaint as true[3] and drawing all reasonable inferences in favor of the non-moving party, it "appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Oneida Indian Nation of New York v. City of Sherrill*, 337 F.3d 139, 152 (2d Cir. 2003); *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003). This is the same standard of review applied in Fed.R.Civ.P. 12(b)(6) motions to dismiss. *Oneida*, 337 F.3d at 152. It is equally well-established in this Circuit that a court may, in appropriate cases, determine the absence of substantial similarity as a matter of law on a motion to dismiss. *Bell v. Blaze Magazine*, No. 99 Civ. 12342, 2001 U.S. Dist. LEXIS 2783, at *8 (S.D.N.Y. Mar. 16, 2001) (Casey, J.) (on a 12(b)(6) motion, "[t]he determination of whether the parties' works are 'substantially similar' may be decided by a court as a matter of law"); *Buckman v. Citicorp*, No. 95 Civ. 0773 (MBM), 1996 U.S. Dist. LEXIS 891, at *10 (S.D.N.Y. Jan. 30, 1996) (Mukasey, J.) *aff'd*, No. 96-7236, 1996 U.S. App. LEXIS 20881 (2d Cir. Aug. 14, 1996) (dismissing claim pursuant to 12(b)(6) because review of two works reveal that they "are not substantially similar, and that any similarities between them relate only to non-copyrightable elements").

Alternatively, the Court may dismiss under Fed.R.Civ.P. 56, if it is satisfied that "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law". *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also Polsby v. St. Martin's Press, Inc.*, 97 Civ. 690, 1999 U.S. Dist. LEXIS 5416, at *1, 11-12 Apr. 15, 1999 (S.D.N.Y. Apr. 19, 1999) (Mukasey, J.) (*aff'd*, 2001 U.S. App. LEXIS 8852 (2d Cir. May 8, 2001) (in copyright case, granting summary

---

[3] On this motion, the Court may refer to Shine's copyright registrations and the representations of Freedom Tower presented to the public on December 19, 2003, as they are referenced directly in the Complaint. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002) ("[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference .... Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint") (citations and quotations omitted).

judgment and dismissing complaint where defendant moved to dismiss pursuant to Rule 12(b)(6) and alternatively for summary judgment), *aff'd*, 2001 U.S. App. Lexis 8852 (2d Cir. May 8, 2001).[4]

As demonstrated below, under either prong of this motion, defendants are entitled to judgment in their favor.

## III.

### SHINE HAS NO COPYRIGHT PROTECTION FOR HIS PUTATIVE ARCHITECTURAL WORKS

To prove copyright infringement in this Circuit, Shine must and cannot demonstrate two things: ownership of a valid copyright and that defendant copied constituent elements of his work that are original. *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *The Procter & Gamble Co. v. Colgate-Palmolive Co.*, 96 Civ. 9123, 1998 U.S. Dist. LEXIS 17773, at *104 (S.D.N.Y. July 15, 1999) (Patterson, J.) *aff'd*, 199 F.3d 74 (2d Cir. 1999). As explored below, Shine cannot satisfy the first prong of this test because he has no copyright in an "architectural work" as defined by the Copyright Act; nor is he entitled to some other form of copyright protection for the assorted collection of models and drawings he annexed to his copyright applications.

### A.    The Scope of Copyright in Architectural Works and Architectural Plans

Because Shine filed for copyright protection for an "architectural work" and because of the paucity of law construing that statutorily-defined term, some context concerning the development of copyright protection for architectural works may be of assistance to the Court. For over two centuries, United States law did not protect constructed buildings under its copyright law. *See Leicester v. Warner Bros.*, 232 F.3d 1212, 1216 (9th Cir. 2000). While technical drawings and plans were eventually deemed copyrightable subject matter (17 U.S.C. § 101), buildings that were built according to those plans were

---

[4]    *See, also, Kregos v. Associated Press*, 3 F.3d 656, 663 (2d Cir. 1993), (affirming grant of summary judgment for defendant where "the similarity between the competing works concerns only 'non-copyrightable elements of the plaintiff's work', or when 'no reasonable jury, properly instructed, could find that the two works are substantially similar'"); *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 48 (2d Cir. 1986) (affirming grant of summary judgment on same basis); *Warner Bros., Inc. v. American Broadcasting Cos.*, 720 F.2d 231, 239-240 (2d Cir. 1983) (same); *Kaplan v. Stock Mkt. Photo Agency, Inc.*, 133 F. Supp. 2d 317, 322 (S.D.N.Y. 2001) (Schwartz, J.) (same).

not. This was a deliberate choice, based in part on the belief that buildings are primarily functional, and the copyright laws do not extend to utilitarian works. *Leicester*, 232 F.3d at 1216-17. It was also informed by the widespread conviction that architecture is by its nature derivative, and that progress in architecture includes – and indeed requires – modifications to and improvements on prior works. *Architectural Design Protection: Hearing on H.R. 3990 and H.R. 3991 Before the Subcomm. On Courts, Intellectural Property, and the Administration of Justice of the House Comm. On the Judiciary*, 101st Cong., 101-102 (1990) (hereinafter, "Subcommittee Hearing") (statement of Jeffrey M. Samuels, Assistant Commissioner for Trademarks, Patent and Trademark office, U.S. Department of Commerce); *id.* at 118 (statement of David A. Daileda, AIA, Smith McMahon Architects, Washington, D.C., on behalf of the American Institute of Architects).

For these reasons and others, when the Architectural Works Copyright Protection Act ("AWCPA") was enacted in 1990 (Architectural Works Copyright Protection Act of 1990, Pub. L. No. 101-650, § 702, 104 Stat. 5089, 5133 (1990), Congress took a minimalist approach (Hearing, Appendix 1 (Kastenmeier)), which is evidenced in the statutory definition of "architectural works" in § 101: Congress limited protection to the "design of a building" and incorporated certain limitations on what components could be deemed to comprise that design. Those limitations are of critical import in the instant case. 17 U.S.C. § 101.

### 1.    Copyright Protection For Buildings Before 1991

It is a fundamental tenet of copyright law that protection does not extend to "useful articles"; that is, works that serve primarily a utilitarian purpose. *See Baker v. Selden*, 101 U.S. 99, 103-04 (1879). That hoary but still vital limitation was codified in the Copyright Act of 1976 (the "'76 Act"), which defines "useful article" as "an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information". 17 U.S.C. § 101. Prior to the adoption of the AWCPA, virtually all habitable buildings were considered utilitarian, and thus unprotected under the rubric of copyright law. As this Court succinctly put it, the definition of useful article "necessarily

includes living quarters". *Demetriades v. Kaufmann*, 680 F. Supp. 658, 663 n. 7 (S.D.N.Y. 1988)
(Goettel, J.).

Under the logic of *Baker v. Selden* which prevailed until the passage of AWCPA, the only types
of built structures that could be protected were those without an intrinsic function, such as monuments.
*See, e.g., Jones Bros. Co. v. Underkoffler*, 16 F. Supp. 729, 731 (M.D. Pa. 1936). Even pictorial, graphic
or sculptural ("PGS") elements incorporated into a building were not protected unless they were separable
from the building. 1 *Melville B. Nimmer & David Nimmer*, *Nimmer on Copyright*, § 2.08[D][2][b], at 2-
126; *see also Leicester*, 232 F.3d at 1227-28 (dissent). *A priori*, since the "design" of a building was not
separable from the building itself, it could not be protected; the aesthetic aspects of a habitable building
were deemed to be bound up with its functional aspects. *Demetriades*, 680 F. Supp. at 665.

### 2.    Copyright Protection for Architectural Drawings

Since the enactment of the Copyright Act of 1909 (the "'09 Act"), the United States has
recognized copyright protection for "drawings or plastic works of a scientific or technical character". 17
U.S.C. § 5(i). Cases interpreting this definition have long included architectural plans within its scope.
*See, e.g., Imperial Homes Corp. v. Lamont*, 458 F.2d 895, 897 (5th Cir. 1972). This provision of the '09
Act was the precursor to § 102(1)(5) of the '76 Act, which recognized PGS Works as "works of
authorship" in which copyright protection subsists, and specifically referenced "technical drawings,
diagrams, and models" as protected thereunder. Although the new definition did not specifically
reference architectural plans, this unintentional omission was rectified by the Berne Convention
Implementation Act of 1988, amending the definition of PGS Works to expressly include "architectural
plans". *See* Senate Report on the Berne Convention Implementation Act of 1988, Senate Report 100-352
(May 18, 1988), at. 8.

While it is now clear that architectural plans can be protected, the scope of that protection is
circumscribed. One important limitation on the copyrightability of all PGS Works – including
architectural plans – is the fact that "mechanical and utilitarian aspects" of those works are not protected:

> the design of a useful article . . . shall be considered a pictorial, graphic
> or sculptural work only if, and only to the extent that, such design
> incorporates pictorial, graphic, or sculptural features that can be
> identified separately from, and are capable of existing independently of,
> the utilitarian aspects of the article.

17 U.S.C. § 101. The '76 Act itself states that it "does not afford to the owner of a copyright in a work

that portrays a useful article as such, any greater or lesser rights with respect to the making, distribution,

or display of the useful article so portrayed than those afforded to such works under the law . . . in effect

on December 31, 1977". 17 U.S.C. § 113(b). Architectural plans for a building necessarily "portray" a

useful article and thus, according to this Court, "the owner of a copyright in architectural plans has

copyright protection in the useful article depicted in those plans . . . only to the extent that such protection

was recognized at law" prior to the enactment of the '76 Act. *Demetriades*, 680 F. Supp. at 663 n.7. As

discussed above, virtually no habitable buildings had previously qualified for protection under *Baker v.*

*Selden* and its progeny.

Prior to the AWCPA, architectural plans exclusive of utilitarian design could be protected as PGS

Works; protection did not extend to the realization of that design in a building. As a consequence, the

copyright owner of architectural plans could prevent unauthorized reproduction of the plans themselves,

but could not prevent the construction of a building from those plans even if the design concepts

embodied in the plans were unpublished and/or unused. *Demetriades*, 680 F. Supp. at 664 (citations and

quotations omitted); *see also Muller v. Triborough Bridge Authority*, 43 F. Supp. 298, 300 (S.D.N.Y.

1942) (Leibell, J.); *Imperial Homes Corp.*, 458 F.2d 899. Only in those cases where the second designer

copied the original drawings and specifications of the original, *i.e.*, infringed the reproduction right by

copying the plans, was there a basis for liability. *See Demetriades*, 680 F. Supp. at 663; *Robert R. Jones*

*Assocs., Inc. v. Nino Homes*, 858 F.2d 274, 280 (6th Cir. 1988).

A second limitation on protection of architectural plans as PGS Works, which is of critical

importance here, is that plans that are nominally "architectural" in nature but are in fact merely

preliminary or conceptual, are not protected. Just how developed as opposed to preliminary a plan must

be in order to qualify for protection is open to some debate, but where infringement is alleged, the stage

of development required is directly proportional to the state of development of the allegedly infringing plans, as illustrated by the two Second Circuit cases on point, *Attia v. Society of the New York Hospital*, 201 F.3d 50 (2d Cir. 1999) and *Sparaco v. Lawler, Matusky, Skelly Engineers*, 303 F.3d 460 (2d Cir. 2002).

In *Attia*, plaintiff architect developed a concept for a new building to adjoin New York Hospital and prepared sketches and drawings to present that concept. After discord arose, the hospital selected a new architect who then developed detailed schematic design drawings for that same building. Plaintiff claimed that those new architectural drawings infringed his initial sketches. Acknowledging the similarities between the parties' respective works, the Second Circuit characterized plaintiff's drawings as "highly preliminary and generalized" and illustrative of his design only "at a very general level of abstraction". *Attia* at 55. While it was possible for preliminary sketches to contain some protectible expression, "[p]laintiff's drawings in this case [ ], at least to the extent copied, consisted only of generalized ideas and concepts pertaining to the placement of elements, traffic flow, and engineering strategies". *Id.* at 57. In contrast, defendants' schematic design drawings "constitute[d] a detailed expression of how to effectuate the [hospital's goals]". *Id.* at 55. The *Attia* Court distinguished earlier cases in which architects had successfully sued for copyright infringement of architectural plans, noting that in each of those cases the architects owned drawings "that were sufficiently detailed to enable construction". *Id.* at 56-57 (*distinguishing Eales v. Envtl. Lifestyles, Inc.*, 958 F.2d 876, 877-80 (9th Cir. 1992); *Hunt v. Pasternack*, 192 F.3d at 877, 880; *Arthur Rutenberg Homes, Inc. v. Maloney*, 891 F. Supp. 1560, 1563 (M.D. Fla. 1995); *CSM Investors, Inc. v. Everest Dev. Ltd.*, 840 F. Supp. 1304, 1310-11 (D. Minn. 1994)).

Several years later, the Second Circuit revisited this question in *Sparaco*, once again in circumstances where plaintiff claimed that his initial "site plan" had been infringed by defendants' later creation of an amended site plan for that same site. The Second Circuit held that plaintiff's depictions of proposed physical improvements were sufficiently detailed, in contrast to the general conceptual ideas in *Attia*, to be protectible: Sparaco's design "provide[d] detailed specifications for preparation of the site ...

a fully realized plan capable of being used to guide actual construction work on numerous site preparation tasks..." 303 F.3d at 468-69.  In assessing how far along on the continuum from conceptual to realizable a plaintiff's work must fall to be protectible, the Court noted – in an apparent retreat from *Attia* – that a technical drawing did not have to support actual construction in order to be protectible as an architectural plan, but it did not draw a bright line divider between the conceptual and constructible. *Id. See also The Rottlund Co. v. Pinnacle Corp.,* Civ. No. 96-30165, 2004 U.S. Dist. LEXIS 16723, at *57 n.25 (D. Minn. Aug. 20, 2004).

The common thread in these precedents is that many technical drawings and plans, by their very nature, are likely to represent mere ideas, concepts and preliminary thinking about a problem (*e.g.*, the construction of a building), and do not represent protectible expression until the architect has contributed details that are not functional or mandated by the underlying ideas or facts.  "What can be learned from *Attia* and *Sparaco*, is the general principle that plans or drawings that merely propose use of conceptual elements are not protectible because, at that general level of abstraction, such plans represent ideas, but where the plans stretch beyond 'vague general notions of relating to placement of elements' . . . and express in detail the manner in which to capitalize on the ideas, copyright affords protection".  *The Rottlund Co.*, 2004 U.S. Dist. LEXIS at *57 (*citing Sparaco*, 303 F.3d at 468).

Neither *Sparaco* nor *Attia* involved a claim of an infringement of an architectural work (the claim Shine makes here), but rather of architectural drawings and sketches denominated PGS Works.  In both cases, the Court had no difficulty finding that conceptual drawings and sketches could not serve as the basis of an infringement action against more detailed architectural drawings.  As demonstrated below, since Shine claims that his drawings, models and renderings rise to the higher level of "architectural works", the place along this continuum must be far more advanced to be accorded any protection at all.

### 3.    The Architectural Works Copyright Protection Act

By enacting the AWCPA and extending copyright protection to the constructed design of buildings, Congress intended to bring United States copyright law "unequivocally into compliance" with its obligations under the Berne Convention.   H.R. Rep. No. 101-735 (1990), *reprinted in* 1990

U.S.C.C.A.N. 6935, 6942. 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 52.20[A], at 2-214-15 (hereinafter "*Nimmer*"). This was accomplished by adding a new category of "works of authorship" – architectural works – to the § 102(a) list: defined, in part, as "the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings". 17 U.S.C. § 101. Thus, architectural works are <u>not</u> a subset of PGS Works, but rather a *sui generis* category. One of the primary reasons for defining architectural works separately was a deliberate attempt by Congress to avoid the "separability" issues raised by PGS Works embodied in useful articles (discussed above). *See* H.R. 101-735 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6935, 6951.

The legislative history makes clear that the purpose of this amendment was to protect buildings that had already been constructed. Subcommittee Hearing, at 191; *see also, National Medical Care, Inc. v. Espiritu*, 284 F. Supp. 2d 424, 434 (S.D. W. Va. 2003) (primary effect of AWCPA was to provide protection to physical architectural works). Originally, the proposed definition was "the design of a building or other three-dimensional structure, as embodied in that building or structure" (Subcommittee Hearing, at 192), but this formulation did not cure the earlier gap in the law where "an architectural work has been depicted in plans or drawings, but has not yet been constructed" (H.R. 101-735 (1990) *reprinted in* 1990 U.S.C.C.A.N. 6935, 6950). To redress this perceived problem, the AWCPA as finally adopted defined architectural works to include not just the constructed design, but designs embodied in "any tangible medium of expression" including plans and drawings. *Id.*; *see* 17 U.S.C. § 101.[5]

With this backdrop, we turn to the complete statutory definition of architectural works:

> An "architectural work" is the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings. The work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features.

---

[5] *See also Hunt v. Pasternack*, 192 F.3d 877, 880 (9th Cir. 1999) ("unconstructed architectural work is not to be denied protection"); *The Yankee Candle Co., Inc. v. New England Candle Co., Inc.*, Civ. No. 96-30165, 1997 U.S. Dist. LEXIS 23099, at *12 (D. Mass. June 26, 1997) (plain from statutory definition that "copyright protection extends to architectural blueprints and the building embodying those blueprints").

17 U.S.C. § 101. The threshold question is what constitutes "the design of a building".[6]  While a constructed building clearly satisfies this requirement, neither party in the instant case has actually constructed a building, so the operative question to determine protectability is whether Shine's models, drawings and Picture embody "the design of a building". In light of the original goal of the AWCPA to limit protection to constructed buildings, it follows that the "design of a building" as embodied in plans must mean a design from which a building *could be* constructed as opposed to other architectural plans which – as the Second Circuit found in *Sparaco* – need not reach that level of specificity in order to be protected as PGS works, a protection that Congress expressly left undisturbed in enacting the AWCPA.[7] That conclusion is reinforced by the absence in both the AWCPA itself and its legislative history of any indication that conceptual drawings, preliminary studies, partial designs, incomplete designs, or inconsistent designs are intended to fall within this new definition.

Even if plans or models are sufficiently detailed to permit construction and therefore constitute the design of a building, copyright protection for an architectural work does not necessarily encompass every element of the design.  The statutory definition expressly covers the "overall form" and "the arrangement and composition of spaces and elements in the design", and expressly excludes "individual standard features".  *See* H.R. 101-735 (1990), *reprinted in 6935,* U.S.C.C.A.N. at  6949 ("Consistent with other provisions of the Copyright Act and Copyright Office regulations, the definition [of architectural works] makes clear that protection does not extend to individual standard features, such as common windows, doors, and other staple building components.  A grant of exclusive rights in such features would impede, rather than promote, the progress of architectural innovation.")   The Copyright Office

---

[6]     While the term "building" is not defined in the AWCPA, Title 37 of the Code of Federal Regulations, addressing the registrability of architectural works, states that "[t]he term building means humanly habitable structures that are intended to be both permanent and stationary, such as houses and office buildings, and other permanent and stationary structures designed for human occupancy, including but not limited to churches, museums, gazebos, and garden pavilions". 37 C.F.R. § 202.11(b)(1) (2005).

[7]     According to legislative history, "[p]rotection for architectural plans, drawings, and models as pictorial, graphic or sculptural works…is unaffected…." H.R. 101-735 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6935, 6950.

subsequently elaborated on this exclusion, stating that the following elements <u>cannot</u> be registered when applying for copyright protection of an architectural work:

> (1)      Standard configurations of spaces;
>
> (2)      Individual standard features (*e.g.*, windows, doors, and other staple building components); and
>
> (3)      Functional elements whose design or placement is dictated by utilitarian concerns.

Circular 41, *Copyright Claims in Architectural Works* (2003), *available* at www.copyright.gov/circs/circ41.pdf. *See also* 37 C.F.R. § 202.11(d) (2005) ("[t]he following structures, features, or works cannot be registered: . . . Standard configurations of spaces, and individual standard features, such as windows, doors, and other staple building components").

The legislative history of the AWCPA also emphasizes that in addition to this express statutory exclusion, all of the traditional limitations on protection found in copyright law – such as those that prohibit protection for ideas, scénes à faire and stock elements, pre-existing works, and functional works – fully apply to architectural works. As noted by the Register of Copyrights: "[c]opyright in architectural works will extend only to original elements, not to any idea, methods, procedures, systems of operations, concepts, principles, or discoveries embodied in the work. Similarly, protection will not extend to standard design elements such as Palladian windows, to elements that are copied from historic sources (since one can not be the author of someone else's work), or to individual common geometric shapes." Subcommittee Hearing, at 46.

Before 1991, copyright protection for architectural plans did not extend to the design embodied in those plans; now, an architectural drawing that is an "architectural work" can also receive protection as a PGS work, so long as an author submits two separate copyright registrations. 37 C.F.R. § 202.11(c)(4) ("Where dual copyright claims exist in technical drawings and the architectural work depicted in the drawings, any claims with respect to the technical drawings and architectural work must be registered

separately").[8]  As before, architectural plans and drawings registered as PGS works remain subject to the separability analysis – that is, the non-functional aspects of those plans and drawings can only be protected to the extent they exist separately from the plan or drawing as a whole.  Where a plan is registered both as a PGS work and an architectural work, the protection for plans as the former covers the drawings themselves but not the building design embodied therein; in contrast, protection for those same plans as an architectural work, covers only the building design.

Distilling the legislative history and subsequent judicial interpolation, the current state of copyright protection for architectural plans and for architectural designs that must be applied to Shine's claim here, is as follows.  *First*, an architectural plan will not be protected under the copyright law – at least as against infringement by another architectural plan or a building – if it is too preliminary or conceptual, as are Shine's plans here.  *Second*, a sufficiently detailed architectural plan or model can be protected as a PGS work, but that protection does not extend to the design embodied in the plan or model, so even if Shine had applied to register a plan (which he did not) and even if that plan were detailed (which it is not), in order to prove infringement by SOM, Shine would have to prove that the specific drawings and models for Freedom Tower displayed on December 19, 2003 are substantially similar to his plan (which they are not).  *Third*, the design of a building as embodied in sufficiently detailed architectural plans can be protected as an architectural work, but only if a building could be constructed from those plans and, as the accompanying Meier Aff't demonstrates, no building could conceivably be constructed from Shine's rudimentary plans and models.

**B.     Shine Does Not Hold A Valid Copyright Interest of Any Kind in His Two Purported Works**

Ownership of a valid copyright is a prerequisite for an action for infringement.  *Procter & Gamble*, 1998 U.S. Dist. LEXIS 17773, at *103.  Although a valid registration with the United States

---

[8]     *See also Craig v. Dabrowski*, No. 98 Civ. 405, 1999 U.S. Dist. LEXIS 9063, at *9 (N.D. Ill. June 8, 1999); *Stephen Hayes Construction, Inc. v. Meadowbrook Homes, Inc.*, 988 F. Supp. 1194, 1197 n.4 (N.D. Ill. 1998); *Kootenia Homes, Inc. v. Reliable Homes, Inc.*, Civ. No. 00-1117, 2002 U.S. Dist. LEXIS 235, at *8 (D. Minn. Jan. 3, 2002).

Copyright Office creates a presumption of ownership (*see, e.g., Williams v. Broadus*, 99 Civ. 10957, 2001 U.S. Dist. LEXIS 12894, at *4 (S.D.N.Y. Aug. 27, 2001) (Mukasey, J.)), that presumption is easily rebutted where defendant demonstrates that the material submitted for registration does not qualify as copyrightable subject matter (*Fonar Corp. v. Domenick*, 105 F.3d 99, 104 (2d Cir. 1997); *Odegard, Inc. v. Costikyan Classic Carpets Inc.*, 963 F. Supp. 1328, 1335 (S.D.N.Y 1997) (Koeltl, J.) ("[T]he presumption of validity may be rebutted where other evidence in the record casts doubt on the question. This presumption can be overcome by a showing that the work was not sufficiently original to be copyrightable.") (citations and quotations omitted); *Torah Soft v. Drosnin*, 136 F. Supp. 2d 276, 282-92 (S.D.N.Y. 2001) (Scheindlin, J.)).[9]

Shine holds two separate copyright registrations that purport to cover the two works he alleges have been infringed by SOM's December 19, 2003 design for Freedom Tower. In both of those copyright applications, Shine represented the nature of the work as a "Scale model of architectural work" and the nature of authorship as an "Architectural work". Comp., Exs. D, E. Neither of the two works were registered as a derivative work or compilation. *Id.*, § 6. Consistent with these representations, Shine alleges here that "Shine 99 and Olympic Tower are original architectural works entitled to protection under Section 102(8) of the U.S. Copyright Act". Comp., ¶ 13.

That Shine did not register his "materials" as PGS works was no accident. As discussed above, while "architectural works" consist of a "design" that can include numerous underlying plans, drawings and other material (so long as they are consistent with a single design of a building), protection for PGS works extends only to the expressive content of the individual works themselves. Had Shine registered his models, drawings and Picture of Olympic Tower as a PGS work, he could not even arguably lay claim to protection for the purported overall "design" embodied in that collection of works; rather, he would have to demonstrate that each of the items included in that registration is copyrightable and has been

---

[9]     Shine's copyright registrations do not disclose that his works have not been built, which is a required disclosure under 37 C.F.R. § 202.11(c)(3) (2005) ("If the building has not yet been constructed, the notation" 'not yet constructed' should be given following the title").

infringed by Freedom Tower. *See T-Peq., Inc. v. Isbitski*, 2005 U.S. Dist. LEXIS 2474, *19 (D.N.H. Feb. 9, 2005) (comparing plans showing similar views but noting difficulty of comparing "fundamentally different kinds of drawings").

If the materials that Shine has labeled Shine 99 and Olympic Tower are not architectural works, then his complaint must be dismissed, because his registrations are invalid. But the fact is that no amendment or substitute registration could cure this defect because the assortment of materials on which he relies are not "works" at all under the copyright law.

### 1.    It is Unclear What Work or Works Shine is Attempting to Protect

The complaint clearly identifies (and in so doing distinguishes) the subjects of the two separate registrations which Shine claims have been infringed. He alleges that SOM's design for Freedom Tower as of December 2003 infringes Shine 99 because "[i]ts overall form and shape is substantially similar to the form and shape of Shine 99". Comp., ¶ 18. He admits that Shine 99 was completed between October 1 and October 15, 1999; consists of a single model with two warped sides and two straight sides; and was the result of an "initial design phase" which "served as a springboard" for his later designs. Comp., ¶ 9. He separately alleges that SOM's Freedom Tower design infringes Olympic Tower (presumably, his "later designs"), because it incorporates an "identical" structural grid, and a "strikingly similar" façade. *Id.* at ¶ 18. Shine began working on those later designs after October 15, 1999, and they consisted of "several sketches and models" that "culminated with a final architectural work entitled 'Olympic Tower'". Comp., ¶ 10. He describes this purported architectural work as a "twisting tower" with a "symmetrical diagonal" structural grid and a "textured curtain wall with diamonds interlocking and protruding to create a crenellated appearance". *Id.*

In striking contrast to the clarity of those allegations regarding his separate registrations, the complaint purposefully blurs the distinction between Shine's purported works when alleging infringement. For instance, Shine alleges generally that Freedom Tower "is strikingly similar to Shine's original works" (Comp., ¶ 1) and that "Defendants' Design was copied from Plaintiff's Works" (*id.*, ¶ 19). While Shine may be alleging that Freedom Tower separately infringes each of Shine's two alleged

works, it seems far more likely that given the nature of the designs in issue, Shine is claiming that Freedom Tower somehow infringes a single "design" by Shine, comprised of some unspecified amalgamation of Shine 99 and Olympic Tower. If the latter is in fact what plaintiff claims, he is sorely mistaken: he cannot claim protection for the combination of the two purported works that are the subject of his separate copyright registrations, as explained below.

### 2.    Shine 99 and Olympic Tower are Not a Single Work

From a copyright perspective, it is crystal clear that the subject matter of Shine's two copyright registrations are *at least two* separate and distinguishable works and are not intended to be, and cannot be considered together as a single work or design.

First, the Copyright Office permits applications for individual architectural works only.   37 C.F.R. § 202.11(c)(2) (2005) ("For published and unpublished architectural works, a single application may cover only a single architectural work. A group of architectural works may not be registered on a single application form.")[10]   Since Shine has registered the single model he calls Shine 99 in one registration, and the collection of materials he says make up Olympic Tower in another registration, he has conceded that -- if they are architectural works at all -- the two are separate architectural works.

Second, neither Shine's registration nor his complaint claims that Olympic Tower is a derivative work based on Shine 99; that is, Olympic Tower does not derive from Shine 99 in a copyright sense. Such a specific claim is required on copyright applications for any derivative work. *Well Made Toy Mfg. Corp. v. Goffa International*, 354 F.3d 112, 115 (2d Cir. 2003) ("Under Section 411(a), registration of a claim on an original work does not create subject matter jurisdiction with respect to a suit for infringement of the original's unregistered derivative"). Likewise, the complaint makes no such claim; indeed, the only nexus alleged between the two is that when Shine presented Olympic Tower to the final

---

[10]      *Cf. Richard J. Zitz, Inc. v. Curran*, 97-CV-0576, 1998 U.S. Dist. LEXIS 23142, at *16 (E.D.N.Y. Nov. 9, 1998) (Platt, J.) (exception for tract housing); *Richard J. Zitz, Inc. v. Pereira,* 119 F. Supp.2d 133, 146-47 (E.D.N.Y. 1999) (Boyle, M. J.) (same).

jury, he "presented detail and structural models (including Shine 99), renderings, floor plans, elevations and sections". Comp., ¶ 11.

Third, even assuming *arguendo* that all of the various models and drawings attached to Shine's copyright registration for Olympic Tower actually describe a single work (which they do not as demonstrated below), that work is not a derivative work "based on" Shine 99 as a matter of law, as the two are inherently and logically different. In full, Shine describes Shine 99 as "a model of a tower, tapering as it rose, having two straight, parallel, roughly triangular sides, connected by two twisting facades, resulting in a tower whose top was in the shape of a parallelogram". Comp., ¶ 9. A review of the Shine 99 model demonstrates that this description is generally accurate as far as it goes, but it is misleading because it tellingly omits what is arguably the most prominent feature of the model: four distinctly-shaped set backs on one of the warped sides, which decrease in size as the building tapers to the top. Comp., Ex. A; Meier Aff't, ¶ 12.

Some of Shine's models and drawings of Olympic Tower include sides that are warped, but this is the extent of the similarity between Shine 99 and Olympic Tower, and even this similarity is but semantic. All four sides of Olympic Tower actually "twist" due to rotation of the building's floor plates, whereas the two warped sides of Shine 99 are produced by successive chamfering, *i.e.* slicing away of the square base as the form rises. The base in each of those Olympic Tower models and drawings is in the shape of a square, while the top is in the shape of a rectangle. Durschinger Aff't, Ex. ¶¶ 19, 22, 24 Olympic Tower (in some models) rotates 90 degrees around an eccentric axis as it rises, so all four sides twist 90 degrees from bottom to top. Meier Aff't, ¶ 15, 33. None of the sides of Olympic Tower are flat or roughly in the shape of a triangle. **In other words, Olympic Tower is a "helical" or spiral form, while Shine 99 is not.** *Id.*, ¶ 15.

Under the '76 Act, a derivative work is "a work based upon one or more pre-existing works…" 17 U.S.C. § 101. How can it be said that a model twists on all sides is based on a model that has two flat sides and two warped sides? And how can a model which has as its most dominant feature recessed set

backs on one side be the underlying work on which a model with no set backs is based?  Stated otherwise, in this Circuit, a derivative must be substantially similar to the underlying work (*Well-Made Toy*, 354 F.3d at 117; *Castle Rock Entertainment v. Carol Publishing*, 150 F.3d 132, 143 n.9 (2d Cir. 1998); *Reyher v. Children's Television Workshop*, 533 F.2d 87, 90 (2d Cir. 1976)) and that is most certainly not the case here.

### 3. Shine Cannot Combine His Materials for Shine 99 and Olympic Tower to Create a Single "Work"

While the definition of "architectural works" suggests that the design of a building may be extrapolated from a series of drawings, models or plans, as a matter of sheer logic, those plans must all point to a single building design, as previously discussed. *See supra pp.* 23.  Here, Shine 99 and Olympic Tower are not only inherently different works they are also incompatible; in other words, one simply could not combine all of the material elements of <u>both</u> Shine 99 and Olympic Tower into a single building.  Although the term "work" is not defined in the '76 Act, cases hold that a work exists for copyright purposes where there is a logical and inherent unity to the underlying material. *See Willis v. Home Box Office*, No. 00 Civ. 2500, 2001 WL 1352916, at *5 (S.D.N.Y. Nov. 2, 2001) (Martin, J.); *Robinson v Viacom Int'l, Inc.*, No. 93 Civ. 2539, 1995 WL 417076, at *8 (S.D.N.Y. 1995) (Patterson, J.); *Williams v. Crichton*, 860 F. Supp. 158, 170 (S.D.N.Y. 1994) (McKenna, J.) *aff'd*, 84 F.3d 581 (2d Cir. 1996); *CK Company v. Burger King Corporation*, No. 92 Civ. 1488, 1994 WL 533253, at *9 (S.D.N.Y. Sept. 30, 1994) (Haight, J.) *aff'd*, 122 F.3d 1055 (2d Cir. 1995).

Shine cannot pluck elements from one work and conglomerate them with equally arbitrarily selected elements from a second work, simply to present a case of substantial similarity. This would be akin to a novelist pointing to several of his novels with different plots, and claiming that a new novel by a third party infringes all of those novels because various plot points within the original novels can be shuffled and made to appear to have a similar sequence. *See, e.g., Williams*, 860 F. Supp. at 170 (rejecting claim of substantial similarity between movie and series of four children's books, where plaintiff mixed and matched from six works and "sifted the works to produce a list of similarities"); *Robinson*, 1995 WL

417076, at *8 (similarly rejecting claim of substantial similarity because plaintiff's "highlighting of similarities" chosen from various episodes of television series would allow plaintiff to "cast too wide a net") (citations omitted).

Directly on point is *Kroencke v. General Motors Corp.*, 270 F. Supp. 2d 441 (S.D.N.Y. 2003) (Rakoff, J.), where a graphic artist alleged that a single advertisement created by defendant infringed seven of her graphic illustrations. Plaintiff argued that the advertisement "infringe[d] some copyrightable aspect common to all seven of her works when those works are viewed in the aggregate", and asked the Court to find that the total concept and feel of the challenged advertisement was substantially similar to the total concept and feel of her aggregated works. *Id.* at 443-44. The Court dismissed this argument out of hand, stating that "nothing in the Copyright Act of 1976 (which refers to the infringed 'work' in the singular) or in the precedents of this Circuit supports the view that a plaintiff's entire *oeuvre*, or even an aggregated portion of it, may be used as the point of comparison where the works included therein bear little or no relation to one another beyond 'style'". *Id.* at 444.

There is simply no support for the conclusion that independent materials can be deemed a single work merely because the author says so, especially where there is no logical or technical consistency between the disparate pieces claimed to be part of the work and they are not derivatives.

## C.     Neither Shine 99 Nor Olympic Tower Is an "Architectural Work"

Shine's purported works fall far short of the standard set by the statutory definition of "architectural works". First, neither work constitutes the "design of a building", but rather at best is a preliminary conceptual model, in the case of Shine 99, or a collection of preliminary and conceptual plans and models, in the case of Olympic Tower. Second, application of the two-step test suggested by the legislative history of the AWCPA demonstrates that neither work is original and both works are functional and therefore neither qualifies as an architectural work.

## 1.   Shine 99 is not an Architectural Work

As described above, Shine 99 consists of a single 10-inch wooden model with no indications whatsoever of intended scale or size. Comp., Ex. A; Durschinger Aff't, ¶¶ 9, 12. Assuming it is indeed a model for something – and it is most certainly not the "scale model of an architectural work" as plaintiff claims in his copyright application – nothing about the model itself indicates its purpose: it could be a toy, a sculpture, a model for a 10-foot marble monument or a model for a 10,000-foot glass tower. *See* Meier Aff't, ¶ 12.

The definition of architectural work in the Act is virtually meaningless as applied to Shine 99: while it has an "overall form", it does not consist of an "arrangement and composition of spaces and elements" because there are no spaces or elements – unless four walls, a bottom and a top are "elements" and the entire featureless interior of the model is a "space" – in which case they are perforce standard ones. That lack of articulated elements also renders it impossible to analyze whether any original elements are functional, except again to note that the four walls and top and bottom of the model serve the "function" of holding it together. Likewise, the exclusion from protection of "individual standard features" in the statutory definition is meaningless because Shine 99 has no features at all, except perhaps for the four set backs on one side. [11] It could not be used to construct a building – the standard suggested by the legislative history – because it lacks any detail whatsoever. Meier Aff't, ¶ 12-13. Even under the somewhat lesser but undefined standard for architectural plans suggested by *Sparaco*, Shine 99 is far too conceptual to fall on the protected side of the continuum. And nothing about Shine 99 indicates that it is a plan for a "humanly habitable structure[ ] . . . intended to be both permanent and stationary". 37 C.F.R. § 202.11(b)(1).

The law is clear that one cannot protect a simple geometric form under copyright law and that is all Shine 99 is: a six-sided geometric form in the shape of a tapering bar with two warped sides. *See*

---

[11]    The significance of the setbacks has not been articulated either in the copyright application or in the complaint and, in any event, since Freedom Tower has no setbacks, these elements are irrelevant to this analysis.

*Kitchens of Sara Lee, Inc. v. Nifty Foods Corp.*, 266 F.2d 541, 545 (2d Cir. 1959) (basic geometric shapes such as circles, rectangles and octagons are not copyrightable); *William S. Geiger Corp. v. Gigi Accessories, Inc.,* No. 97 Civ. 5034, 1997 WL 458668, at *2 (S.D.N.Y. Aug. 11, 1997) (Martin, J.) ("plaintiff has no right to copyright a rose or a common geometric shape"); *Tompkins Graphics, Inc. v. Zipatone, Inc.*, Civil Action No. 82-5438, 1983 WL 398, at *2 (E.D. Pa. August 15, 1983) (plaintiff cannot claim copyright infringement of variations of squares, rectangles, circles and ellipses because "[s]uch basic geometric shapes have long been in the public domain and therefore cannot be regulated by copyright"). If plaintiff were correct and Shine 99 is an architectural work, then anyone can preclude the construction of a building in any particular geometric shape – an ellipse, a pyramid, or an egg – merely by creating a small model in that shape and registering it for copyright protection as an architectural work. This is not and cannot be the law. *See Morrissey v. Procter & Gamble Co.*, 379 F.2d 675, 678-79 (D. Mass. 1967) (where subject matter is so narrow that it "necessarily requires ... if not only one form of expression, at best only a limited number, to permit copyrighting would mean that a party or parties, by copyrighting a mere handful of forms, could exhaust all possibilities of future use") (citations and quotations omitted).

Shine 99 also runs afoul of the merger doctrine, which is based upon the fundamental principle that ideas cannot be protected by copyright, but rather only the concrete expression of those ideas. Where an idea and its expression are so interwoven in a work that they cannot be separated (*i.e.*, that the expression cannot be protected without restricting the use of the idea by other parties), the work is not entitled to protection. *See, e.g., MyWebGrocer, LLC v. Hometown Info, Inc.*, 375 F.3d 190, 194 (2d Cir. 2004) ("The merger doctrine bars a copyright of even original expression 'when there is essentially only one way to express an idea' and thus 'the idea and its expression are inseparable.'") (citing *Altai*, 982 F.2d at 707-08). Here, the idea or concept behind Shine 99 is a 10-inch tapering model with two warped sides and two flat sides (putting aside the four irrelevant setbacks), and the actual model is the physical embodiment of that idea, with no added detail, ornamentation or elaboration. It is hard to imagine a more pure example of the merger doctrine than Shine 99.

## 2.     Olympic Tower is not an Architectural Work

Shine's claim of copyright protection for Olympic Tower is based upon two models, three drawings, and one picture. Although the complaint alleges that Shine's "efforts culminated with a final architectural work" (Comp., ¶ 10), for our purposes, that "final" work is expressed only in those materials appended to his copyright registration. *Warner Bros v. American Broadcasting Company*, 654 F.2d 204, 207 (2d Cir. 1981); *Geritrex Corporation v. Dermarite Industries*, 910 F. Supp. 955, 966 (S.D.N.Y. 1996) (Conner, J.); *Pristine Industries v. Hallmark Cards*, 753 F. Supp 140, 148 (S.D.N.Y. 1990) (Sweet, J.).

For all the reasons stated in the previous section, just as Shine cannot cherry pick elements from Shine 99 and Olympic Tower to create one work, he cannot retrospectively choose individual elements from his various materials registered as "Olympic Tower" to create one architectural work, *i.e.*, one design for a building. The various models and drawings he calls "Olympic Tower" do not form a unitary, consistent work for copyright purposes, notwithstanding his claim to have presented them as such in the classroom, and notwithstanding a loose, common theme among <u>some</u> of these models and drawings. This is particularly the case as Shine included no coordinating drawings or documents indicating how these various models and drawings could conceivably be combined to form a single "design".

The material inconsistencies among these Olympic Tower materials make it impossible to build a building from them that would include <u>all</u> of the elements in those models and drawings or to rationally blend them. As set forth in the accompanying Meier Affidavit, the number of diagonal columns on each side of Olympic Tower is different in the models than it is in the rudimentary drawing of floor plates. Meier Aff't, ¶ 17. The models and drawings also differ with respect to the number of floors shown, and thus the total number of floors in Olympic Tower is indeterminate. *Id.*, ¶ 18. Likewise, the curtain wall or cladding of Olympic Tower is shown in the Picture as in filling, *i.e.*, being set into the depth of, the structural column grid, whereas in Model 2 (the only model that presumably shows the cladding), there is no indication whatsoever that the cladding is recessed. *Id.*, ¶¶ 19, 22.

In addition to these inconsistencies, Shine's Olympic Tower materials are so rudimentary that it would require a tremendous amount of extrapolation and independent design work even to use his materials as a starting point for the design of a skyscraper. *Id.*, ¶¶ 16-23. As in the case of Shine 99, these Olympic Tower models also could represent anything from a small sculpture to a massive monument; they are little more than simple constructions that are merely conceptual in nature. *Id* , ¶ 16. The three drawings are at best cryptic (Meier Aff't, ¶ 16); the models and drawings do not convey the critical information as to the proposed building's overall height, width, scale, or floor height (*id.*). Other than the structural diagrid (in some of the models and in the Picture); the cladding (in the Picture and possibly one model); and a slit for an entrance in one model; Olympic Tower has a featureless exterior. *Id.*, ¶ 16, 23. There is an even more pronounced lack of detail with respect to interior architecture; all Shine offers is a rudimentary area that may be an elevator core. *Id.*, ¶ 16.

Even Shine's later supplied verbal description as to how the curtain wall diagrid follows the twisted wall or his description of three entryways aligned to the elevator core in *Retrospecta* Magazine (Comp., Ex. C) does not add enough fixed expression to render that information part of the "design". If a copyright holder could later just amplify his or her registration to fill in the interstices, how could one know what protection is claimed and thus avoid infringing? That is tantamount to a claim by a playwright that his treatment has been infringed by another play which, he alleges, infringes the matter he intended to add to his treatment in his final screenplay. That is not the law.

In his affidavit, Richard Meier identifies four stages of architectural development -- the initial conceptual design phase and three later phases – referencing the American Institute of Architects ("AIA") Handbook of Architectural Practice. Meier Aff't, Ex. ¶ 9. As Meier explains, considering Shine's Olympic Tower materials *in toto* under that standard, the "work" falls squarely in the "conceptual design" phase – far from an architectural work – and with virtually no original expression beyond the basic concepts of shape and structure. *Id.* ¶ 16, 23.[12]

---

[12]    Olympic Tower does not even approach the level of detail required by the second stage of

Finally, we examine Shine's Picture, an apparent color "photomontage" of what appears to be the outer wall of a building with a sunset or sunrise in the background. This one item might conceivably be entitled to separate copyright protection as a PGS work, as there are likely sufficient expressive elements in that Picture to render it copyrightable. But that protection would not extend to the object photographed or otherwise copied, *i.e.*, the curtain wall; copyright protection would extend only to the camera angle, lighting, *etc. See Kaplan*, 133 F. Supp. 2d at 323 (S.D.N.Y. 2001) (Schwartz, J.) ("Protectible elements may include posing the subjects, lighting, angle, selection of film and camera, [and] evoking the desired expression, along with other variants.") (citations and quotations omitted); *Leibovitz v. Paramount Pictures Corp.,* 137 F.3d 109, 116 (2d Cir. 1998) (lighting and camera angle); *Rogers v. Koons*, 960 F.2d 301, 307 (2d Cir. 1992) (posing the subjects, lighting, angle, selection of film and camera). Assuming the photograph qualifies for such protection (and assuming registration as such), Shine would have to prove -- and once again simply cannot prove because of the differences in expression of those photographs -- that the December 19, 2003 display of the curtain wall of Freedom Tower (Durschinger Aff't, Ex. P) infringes his Picture. For all of these reasons, Olympic Tower is not the design of a building.

### D.    The Identifiable Elements of Olympic Tower are Either Unoriginal or Functional or Both[13]

The House Report for AWCPA posits the following analysis to determine the protectability for an architectural work:

> First, an architectural work should be examined to determine whether there are original design elements present, including overall shape and interior architecture. If such design elements are present, a second step is reached to examine whether the design elements are functionally required. If the design elements are not functionally required, the work is protectible without regard to physical or conceptual separability.

---

architectural design, schematic design, for which the "typical documentation" may include a site plan, plans for each level, all elevations, key sections, an outline specification, and drawings at 1/16" scale. Meier Aff't., Ex. C.

[13]    Given the absence of any articulated design elements save for the setbacks in Shine 99, we do not apply this two-step analysis to that work. But *per force*, under this reasoning, Shine 99 is not original.

H.R. 101-735. Assuming a copyright claimant has met the threshold requirement of a "design for a building" (*i.e.*, something from which a building could be constructed), these twin inquiries as to originality and functionality address all of the elements of the statutory definition, as well as echo the substantial body of case law involving copyright protection of other kinds of works.

Under the first prong of this test, original overall forms and arrangements of spaces and elements are contrasted against standard or pre-existing formulations. If there are no original design elements present, then the inquiry is at an end and the purported design is not protectible as an architectural work. Under the second prong, the surviving elements are weighed against the ever-present concern in copyright law that designs (even original ones) that are dictated wholly or largely by function not be protected so as not to remove them from currency, thereby limiting or suppressing future creativity.

Only if there are original elements that are <u>not</u> functionally required, can copyright protection attach to the combination of those elements. In this case, none of the elements Shine has identified or that can be logically inferred from a review of the collection of materials attached to his copyright registration -- including a structural diagrid, a twisting shape, a textured curtain wall, a ground-level entrance, or an elevator core -- are original and non-functional, as summarized below and detailed in the Meier Aff't.

*Diagrid* -- Shine cannot claim that his purported use of a structural diagrid – which is suggested in some but not all of his Olympic Tower models – is original. Diagrids have been used as perimeter support structures since at least 1927 when they were first used for radio towers near Moscow by Vladimir Suchov, Meier Aff't, ¶ 25, Ex. E. Their use in tall buildings was in fact pioneered by SOM in designs created in the 1950s and in constructed buildings such as the John Hancock Tower in New York and the Alcoa Building in San Francisco in 1967. *Id.* Structural diagrids are now very much in vogue, as evident from the Hearst building now in construction on 57th Street and Eighth Avenue. Additionally, diagrids have been proposed for buildings with non-planar surfaces for years, beginning with an I. M. Pei design for a conical tower at Grand Central Station in the 1950s, and exemplified most recently by numerous design proposals for the World Trade Center site. *Id.*, ¶¶ 25-26, 42; Exs. E, F, L.

A structural diagrid is not only functional because it is part of the load-bearing support system of a building, but also because it provides rigidity to a building's perimeter, deflects stress or load laterally, and may perform a safety function by providing redundancy in the event of partial collapse. Meier Aff't, ¶ 20. Given the limited information in Shine's materials, it is of course not entirely clear which of these functions Shine's diagrid are intended to serve, but he cannot, by virtue of omitting all salient architectural details, convert his diagrid to a non-functional use!

The angle of the diagonal structural columns – and hence the shape of the resulting "diamonds" in the grid – is largely mandated by physics, because as a practical matter, there is a limited range of angles between vertical and horizontal that permit the diagrid to efficiently perform the various functions noted above. *Id.*, ¶ 20. Echoing the cases cited regarding Shine 99, no one may claim a monopoly on a geometric shape. If Shine could obtain copyright protection for the particular dimensions of his diamonds (assuming they were in fact diamonds, *i.e.*, that the intersecting bars actually crossed, which they do not, *id.*) then that would remove one of only a few different diamond shapes that could support a building and severely hamper the ability of others to use diagrids as a structural element at all. What if someone were to claim copyright protection for the particular dimensions of a rectilinear grid – that is, a grid of vertical columns and horizontal floor plates – such as those used in virtually every tall building on Avenue of the Americas? How could anyone else ever build a building without infringing that particular grid?

**Twisting Tower** — There are extensive architectural precedents for "twisting" towers, beginning at least as early as 1980, with a helical tower proposed by Charles Thornton and Harry Weese of the architectural firm Lev Zetlin in New York. Meier Aff't, ¶ 27, Ex. 6. SOM's first proposal for a helical tower was in 1995 for the Xiamen Posts and Telecommunication Building project in China. *Id.* The late 19990s – around the time Shine was at Yale – there was a virtual tidal wave of twisting tower projects, both proposed and constructed, that continues unabated today. These include Santiago Caltrava's "Turning Torso" tower in Sweden, a proposed central tower for LaGuardia Airport, and the de Young Museum in San Francisco. *Id.* While Shine may have decided to ride this wave when he began his studio project at Yale, he was not the progenitor of the concept of a twisting tower.

*Façade* -- The decision to use a textured façade is merely an idea; all that could conceivably be protectible is the particular expression of that concept, as best as that idea can be discerned from Shine's rudimentary materials. *See Ale House Management, Inc. v. Raleigh Ale House, Inc.*, 205 F.3d 137, 143 (4th Cir. 2000) (even "casual comparison" of plaintiff's and defendant's floor plans "shows, at most, the imitation of an idea or a concept, but not a copying of the plans themselves"); *Kootenia Homes,* 2002 U.S. Dist. LEXIS 235, at *17 (finding no similarities between homes except at the level of mere ideas, but finding multitude of differences at level of expression). A curtain wall façade also serves a very basic function: it provides a skin that prevents a building's interior from being open to the elements, and allows light to enter. Meier Aff't, 28-29. Here, it appears from the single detailed representation of Shine's façade -- the Picture -- that the glass and mullions (*i.e.*, the curtain wall or glazing) fill in between exposed structural members, or in other words its shape follows from the structural grid itself. *Id.* ¶¶ 19-22, 39-40. Further, the apparent fact that glass plates rise and fall in a "weaving" pattern made up of long triangular planes, may well be dictated by the physical need to "resolve" the warped surface through triangulation. *Id.*, ¶¶ 39-40.

The use of a textured cladding is also not original to Shine. Used for public buildings at least as early as 1817 (*see* Meier Aff't, ¶ 28, Ex. H), it was used <u>extensively</u> in high-rise construction by Frank Lloyd Wright on buildings such as the Lacy Hotel in Dallas, constructed in 1956. Meier Aff't, ¶ 29, Ex. I. The most famous early use of a textured cladding that takes the form of elongated diamonds is the American Air Force Academy Chapel, built in Colorado in 1961. Meier Aff't, ¶ 30, Ex. J.

*Remaining Elements* -- Presumably all buildings must have an entrance (unless they are pure monuments), and most buildings are entered at ground level. There is what might be an entrance in Model 2 -- it has an opening on one side created by removing half of a diamond shape -- but there are no other distinguishing features. Durschinger Aff't, ¶ 20; Meier Aff't, ¶ 23. Given the wholesale lack of expression in this "entrance", it is primarily if not entirely functional. Finally, the elevator core that seems to be depicted in some of Shine's materials obviously serves a functional purpose and is a standard

feature in all high-rise buildings; indeed, high-rise buildings developed in part as a response to the invention of the elevator. Meier Aff't, ¶¶ 9, 11.

In sum, all of the elements of Olympic Tower serve a primarily functional purpose and have little if any aesthetic value beyond that intrinsic functionality.

### E. Even if Shine Can Claim Protection for His Selection, Coordination and Arrangement of These Otherwise Unprotected Elements, His Particular Choices are Either Unoriginal or Functional

The above analysis lays bare any claim that Shine might have to copyright protection for those elements of Olympic Tower that he has articulated. All that he has is a primitive articulation of standard or stock features previously used in architecture or architectural design. Meier Aff't, ¶¶ 24 to 31. Because that showing falls so far short of the mark, Shine will no doubt claim that it is his decision to combine these particular unprotectible elements that merits protection. While there are two potential sources for such collective protection – the statutory definition of architectural works and copyright protection for compilations generally – compilation theory (regardless of its source) is of limited if any utility with respect to a work such as Shine's works in which so few choices as to selection, order and arrangement have been made. Stated otherwise, the preliminary nature of Shine's ideas for Olympic Tower and all of the exterior and interior design elements he has *not* articulated, make it difficult if not impossible to isolate his choices and apply to them the very thin protection accorded to a compilation under *Feist.* For this very reason, the Copyright Office does not extend protection for the selection, coordination and arrangement of pre-existing materials to combinations of merely a few unprotectible elements. See *Compendium II of Copyright Office Practices*, p. 307.01 ("any compilation consisting of less than four selections is considered to lack the requisite original authorship").[14]

---

[14]    *See also Lamps Plus, Inc. v. Seattle Lighting Fixture Co.*, 345 F.3d 1140, 1147 (9th Cir. 2003) holding that ("a combination of unprotectable elements is eligible for copyright protection only if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship"); *Satava v. Lowry*, 323 F.3d 805, 811 (9th Cir. 2003) (same).

The statutory definition of an architectural work expressly includes "the arrangement and composition of spaces and elements in the design". Of course, as addressed above, the underlying assumption is of a very high degree of articulation of those elements because one must be able to construct a building from the plans and models in order to qualify as an architectural work in the first place. When architectural plans detail precisely such things as dimensions, the layout of interior spaces (*e.g.*, stairs, toilet rooms, elevator, and specifications of materials for ceilings, walls and floors), the selection, order and arrangement of those choices might indeed be meaningful. ***But that is not this case.***

Few cases have parsed the statutory definition of architectural works and it is unclear at best whether the definition envisions protection akin to protection for a compilation. Contextually, when the AWCPA was enacted in 1990, the Circuits were divided as to whether copyright protection could be accorded on a "sweat of the brow" theory, absent originality. The following year, the Supreme Court resolved that Circuit split in *Feist,* considering whether a compilation of otherwise nonprotectible elements could be protected by copyright. Although facts themselves are not copyrightable, the Act defines "compilation" as a collection of pre-existing materials "that are selected, coordinated, or arranged *in such a way that* the resulting work as a whole constitutes an original work of authorship." *Feist*, 499 U.S. at 356 (emphasis in original). The Court held that "[n]o matter how original the format", pre-existing material that was not originally subject to copyright does not gain protection by virtue of inclusion in a compilation. *Id.* at 349. "This inevitably means that the copyright in a factual compilation is thin". *Id.* Further, protection does not extend to a compilation of *generic* elements. *CBS Broadcasting Inc. v. ABC, Inc.,* 02 Civ. 8813, 2003 U.S. Dist. LEXIS 20258, at *23-24 (S.D.N.Y. Jan. 14, 2003) (Preska, J.) In *CBS,* the court compared the television shows "I Love Lucy" and "The Honeymooners": although both "were examples of domestic situation comedies and shared the elements of family/couple characters, plots based on gender stereotypes, laugh tracks and a three-act structure", the shows expressed these "congruent elements" differently. *Id.* That is, only elements that constitute a sufficiently concrete expression of the underlying ideas are protectible in combination. *Id.* at 24-25.

Assuming the statutory definition encompasses or references compilation protection, and assuming that a combination of only a few elements (which is all Shine can claim here) is protectible under *Feist,* he still must be able to demonstrate that his selection, order, and arrangement of those elements, expressed in sufficient detail, is original. The various architectural works (whether actually constructed or not) annexed to the Meier Aff't, along with the various designs proposed for the WTC site, demonstrate that that is not the case. See Meier Aff't, Ex. E (I.M. Pei's proposed Grand Central Tower and SOM's Oakland Alameda Stadium demonstrating structural diagrids on non-planar surfaces); *Id.*, Ex. 42. (WTC and other designs showing diagrids on warped and twisted surfaces); Meier Aff't, Ex. J (Air Force Academy Chapel showing textured glazing and elongated diamond shapes).

## IV.

### ASSUMING *ARGUENDO* SHINE'S WORKS ARE PROTECTIBLE, SOM DID NOT COPY THOSE WORKS

The second prong of the infringement analysis asks whether there has been "copying of constituent elements of the work that are original". *Richard J. Zitz, Inc. v. Pereira*, No. 99-9399, 2000 U.S. App. LEXIS 22418, at *10 (2d Cir. Aug. 31, 2000) (citation omitted). To prove copying, a plaintiff must demonstrate actual copying, and if actual copying is shown, "that the copying amounts to an improper or unlawful appropriation". *Castle Rock*, 150 F.3d at 137 (citation omitted). In the absence of direct proof of actual copying, a plaintiff must demonstrate that defendant had access to the allegedly infringed work, and that there are similarities in the allegedly infringing work that are probative of copying. *Id.* "Probative similarity" is the test for actual copying; the test for unlawful appropriation is "substantial similarity". *Id.* Although these tests are often conflated, the distinction is important because the probative similarity test can act as a short-cut where no copying has occurred. *See generally Green v. Lindsey*, 885 F. Supp. 469, 479 (S.D.N.Y. 1992) (Mukasey, J.). That is, if there is simply no evidence of similarities between the works, there is no need to revert to the various tests for substantial similarity. *See generally CBS Broadcasting,* 2003 U.S. Dist. LEXIS 20258, at *2-3.

For the purposes of this motion only, defendants concede access to plaintiff's works.[15]  However, defendants do **not** concede probative similarity.  The simple fact is that comparison of Shine 99 and Freedom Tower, and of Olympic Tower and Freedom Tower, do not reveal any "similarities that, in the normal course of events, would not be expected to arise independently in the two works".  *CBS Broadcasting, Inc.*, 2003 U.S. Dist. LEXIS 20258, at *3.  Expert testimony and analytic dissection of the works being compared is permitted to aid the court in this analysis, *see Castle Rock Entertainment*, 150 F.3d at 137; *Repp & K & R Music, Inc. v. Webber*, 132 F.3d 882, 889 (2d Cir. 1997), and the annexed Meier Affidavit explains in detail why no similarities exist here that are probative of copying.[16]  Although for these purposes the Court considers not only those portions of Shine's works that are protected by copyright, but also any unprotectible elements of them, the only duplication here is the claim that each is a tall modern building made of steel and presumably glass, with some visual suggestion of a twist or warp, and with a loose diagonal structure or decoration or both.  Given the prevalence of each of these elements in modern architecture and in many of the WTC submissions,[17] even assuming that these elements are in fact present in both plaintiff's works and Freedom Tower, this does absolutely nothing to prove actual copying and the analysis can end at this point.

Assuming the court proceeds to the question of unlawful appropriation, regardless of the test applied to determine substantial similarity – whether the *Altai* abstraction, filtration, comparison test; or

---

[15]    Defendants have not conceded access in this action. They do admit that defendant Childs briefly observed some unknown works allegedly designed by Shine at the final jury at Yale. Answer of David M. Childs, ¶ 11. Defendants also do not raise the issue of independent creation at this juncture (*id.*, ¶ 38; ,Answer of SOM, ¶ 3, but should the complaint survive this motion, the well-documented history of the Freedom Tower's design evolution will be a cornerstone of the defense.

[16]    Likewise, the Meier Affidavit is admissible to highlight examples of prior art and to identify elements of the Shine works that are functional. *See, Kieselstein-Cord v. Accessories By Pearl, Inc.*, 632 F.2d 989, 993-94 (2d Cir. 1980) (expert testimony supported conclusion that belt buckles "rise to the level of creative art" and are "conceptually separable from their subsidiary utilitarian function"). *Cf. Carol Barnhart Inc. v. Economy Cover Corp.*, 773 F.2d 411, 423-24 (2d Cir. 1985) ("expert opinion and survey evidence ought generally to be received" to determine whether a design has a utilitarian function).

[17]    *See, Imagining Ground Zero*, pp. 128-29 (Peter Eisenmann); 140-41 (Office dA); 147 (Krveck's Sexton); 192-93 (Michael Sorkin Studio); 198-99 (Richard Dattner).

the statutory definition of architectural works; or general compilation theory; or total concept and feel – it is abundantly clear that SOM's December 2003 design for Freedom Tower [18] is not substantially similar to either of plaintiff's purported architectural works.[19]

### A.   The Various Tests for Analyzing Substantial Similarity

There are two fundamental ways in which an infringer can reproduce or copy a protected work: literal copying and non-literal copying. Literal copying is, for the most part, simple to recognize and simple to analyze: it involves virtually verbatim replication or paraphrase of a copyrighted work. *Castle Rock*, 150 F.3d at 140 ("fragmented literal similarity" test "focuses upon copying of direct quotations or close paraphrasing"); 4 *Nimmer,* § 13.03[A][2], at 13-53. The vast majority of the copyright decisions involving architectural plans (whether analyzed as PGS works or architectural works) involve just such verbatim copying of the original plans. *See, e.g., Bonner v.* Dawson, 2003 U.S. Dist. LEXIS 19069,*-17-18 (W.D. W. Va Oct. 14, 2003); *Cornerstone Home Builders, Inc. v. McAllister*, 303 F. Supp.2d 1317, 1320-21 (M.D. Fl. 2004) This is hardly surprising, as typically only a full set of completed plans would be useful to a party wishing to use those plans to build a building. In many of these cases (including *Attia* and *Sparaco*), one architect was supplanted by another for the same project. Of course there was access and of course the question is clearly framed: is the second work a literal copy of the first? Here, there is no such direct link: Shine does not allege that he submitted an architectural design for Freedom Tower to the developer of the WTC site, who turned around and handed that design to SOM to work from.

---

[18]   Shine alleges that SOM's December 19, 2003 display constitutes an act of infringement. But simply because that is all that was displayed (and therefore these materials are all that could even theoretically have infringed Shine's putative copyrights), does not mean that those particular materials constitute all that had been designed and developed with respect to Freedom Tower as of that date. To the contrary, Freedom Tower was far more detailed as of that date (Durschinger Aff't, ¶ 42), and it is Freedom Tower as it then existed in its totality, that controls for purposes of the substantial similarity analysis of two alleged architectural (as opposed to PGS) works.

[19]   Shine 99 falls so far short of copyright protection of any sort that we do not address substantial similarity with respect to that work in this memorandum and refer to ¶¶ 12 to 15 of Meier Aff't which demonstrates the total absence of this required element of Shine's claim.

Alternatively, courts recognize that a work can be infringed where a third party reproduces the "fundamental essence or structure" of it, otherwise known as "comprehensive non-literal similarity". *Computer Ass'n Intern, Inc. v. Altai, Inc.*, 982 F.2d 693, 701 (2d Cir. 1992); *Horgan v. Macmillan*, 789 F.2d 157, 162 (2d Cir. 1986); *Twentieth Century-Fox Film Corp. v. MCA, Inc.*, 715 F.2d 1327, 1329 (9th Cir. 1983); *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1167 (9th Cir. 1977); *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 55 (2d Cir. 1936)). This means that, in appropriate cases, copyright may protect against a taking of the plot and sequence of events in a novel or other fictional work; the non-literal elements of a computer program; or, as we have seen, of the selection, coordination and arrangement of a compilation of factual information.

Both in the case of literal and comprehensive non-literal similarity, the operative questions are how to compare the works to see if such similarity exists and from whose perspective that comparison should be made.

With respect to non-technical works, similarities may be readily apparent to the lay eye. For this reason, the Second Circuit has long employed the "ordinary observer" test, which asks "whether an average lay observer would overlook any dissimilarities between the works and would conclude that one was copied from the other". *Arnstein v. Porter*, 154 F.2d 464 (2d Cir. 1946); *see also Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 70 (2d Cir. 1999). Although that time-honored test may be still appropriate in many situations,[20] courts have recognized that this test is woefully inadequate where the works in question are highly technical, where the allegedly copied work consists of a mixture of protectible and non-protectible elements,[21] and/or where the allegedly copied work is

---

[20]     *Nimmer* argues that the application of this judicially formulated test is questionable across the board, as the Supreme Court has never adopted it. § 13.03[e][1], at 13-82. As he points out, the Supreme Court's *Feist* decision defines infringement as "copying of the constitute elements of the work that are original" (471 U.S. at 548) without any mention of the effect on the public (*see id.*). *Nimmer* advocates discarding the audience test in favor of a "successive filtering" which takes out the elements copied from prior works, raw facts, scénes à faire, and any merger of idea and expression. 4 §13.03[E][1][b], at 13-87.

[21]     Where the work that allegedly had been copied contains not only protectible material, but also unprotectible elements, the Second Circuit applies a "more discerning" substantial similarity test that

utilitarian or highly conceptual. Consequently, a number of alternative tests to ascertain whether two works are substantially similar have been developed by the courts, in lieu of this ordinary observer test. *See, Castle Rock*, 150 F.3d at 139-41.

Over two decades ago in *Altai*, the Second Circuit formulated one of those alternate tests in the context of non-literal copyright infringement of computer programs – a particularly thorny issue because computer programs of necessity contain much that is functional and/or conceptual in nature (and therefore unprotectible) – but also might incorporate creative elements. *Altai*, 982 F.2d at 703. In these circumstances, the Court concluded that the lay observer test was not appropriate. *Id.* at 713; *see also* 4 *Nimmer* § 13.03[E][4], at 13-101 ("[P]lainly, it is meaningless to attempt to isolate the 'spontaneous and immediate' reaction of the lay observer to two sets of object code"). To accommodate these concerns, the Second Circuit articulated the following test for computer programs:

> In ascertaining substantial similarity under this approach, a court would first break down the allegedly infringed program into its constituent structural parts. Then, by examining each of these parts for such things as incorporated ideas, expression that is necessarily incidental to those ideas, and elements that are taken from the public domain, a court would then be able to sift out all non-protectable material. Left with a kernel, or possibly kernels, of creative expression after following this process of elimination, the court's last step would be to compare this material with the structure of an allegedly infringing program. The result of this comparison will determine whether the protectable elements of the programs at issue are substantially similar so as to warrant a finding of infringement.

*Altai*, 982 F.2d at 706. With respect to the abstraction prong, which the Court analogized to "reverse engineering", *Altai* requires courts to "dissect the allegedly copied program's structure and isolate each level of abstraction contained within it." *Id.* at 707. For the filtration prong, the Court endorsed *Nimmer's* "successive filtering method" to filter out non-protectible material by "examining the structural components at each level of abstraction to determine whether their particular inclusion at that level was 'idea' or was dictated by considerations of efficiency, so as to be necessarily incidental to that idea;

---

excluded the unprotectible elements from consideration. *Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 141 (2d Cir. 1992); *Folio Impressions, Inc. v. Byer California*, 937 F.2d 759, 763 (2d Cir. 1991).

required by factors external to the program itself; or taken from the public domain . . . ." *Id.* [22]  The goal of filtration is to a reveal the "core of protectable material." *Id.* at 708, 710.

### B.     The *Altai* Test Is The Most Appropriate One For Architectural Works

In support of the filtration analysis, *Nimmer* cites the salient differences between highly complex and/or technical works such as computer programs and works such as literature.  He argues that authors of computer programs do not always have the broad range of choices of expression available to authors of traditional literary works; external factors, such as the computer on which the program is to run, the other software with which the program must interact, and the nature of the problem to be solved, dictate many aspects of the program's design, structure, or actual code.  In addition, an extensive body of computer science literature, rather than the individual programmer's creativity, provides numerous common programming techniques found in a wide variety of programs.  4 *Nimmer* § 13.03[F][1][b], at 13-87.  If one were to substitute "architecture" for computer programming, and substitute the external factors that influence architecture (such as the demands of clients, the physical site, government regulations, safety considerations, functionality, economy, and efficiency) for those that influence computer programming, and "standard configurations" or "individual standard features" for "common programming techniques", *Nimmer's* description compellingly demonstrates the rationale for applying the *Altai* test to architectural works.

### C.     Who Is The Proper Audience for Architectural Works?

The ordinary observer test posits a viewer sufficiently knowledgeable to "overlook any dissimilarities", but what of works about which the ordinary observer is not sufficiently knowledgeable to make that distinction?  Courts recognize that where a work is intended for a particular audience, the ordinary observer should be a member of that particular audience. *Dawson v. Hinshaw Music, Inc.*, 905 F.2d 731, 733 (4th Cir. 1990); *Tienshan, Inc. v. C.C.A. Int'l, Inc.*, 895 F. Supp. 651, 658 (S.D.N.Y. 1995)

---

[22]        *See, e.g., Novak v. NBC*, 716 F. Supp. 745, 752 (S.D.N.Y. 1989) ("after the court 'distills' out' the unprotectible ideas and scénes à faire", summary judgment for defendant), later opinion 724 F. Supp. 141 (S.D.N.Y. 1989) (Sweet, J.); *Laureyssens,* 964 F.2d at 141-42 (filtering out unprotected elements for purposes of substantial similarity).

(Stein, J.) (citing *Arnstein*, 154 F.2d at 473). At least one district court has specifically held that the appropriate audience for reviewing substantial similarity in the context of architectural works is "architects, builders and general contractors". *National Medical Care, Inc.*, 284 F. Supp.2d at 436.

Certainly, the design or architectural plan for a skyscraper is not generally used or perused by the average lay observer; to the contrary, it is the structural engineer, the construction team, the building owner and those involved in the translation of the design or plan into concrete and steel who are the "audience" for these technical works. Of course, a lay observer may be able to look at two completely built buildings and see certain superficial similarities and differences between them, but the definition of architectural works does not lend itself to superficial analysis, as it includes both the interior and exterior spaces and the entire combination of elements that make up the design for the building. As the Fourth Circuit observed in *Dawson*: "[O]nly a reckless indifference to common sense would lead a court to embrace a doctrine that requires a copyright case to turn on the opinion of someone who is ignorant of the relevant differences and similarities between the two works." 905 F.2d at 735.

### D.   The Court Can And Should Receive Expert Testimony to Aid in the Substantial Similarity Analysis of Architectural Works

Given the complexity of the subject matter at issue, defendants rely upon the expert affidavit of world-renowned architect Richard Meier.[23] That affidavit is admissible on this motion not only on probative similarity, prior art and functionality, but also on substantial similarity, both because the proper audience for architectural works is a specialized one, and because the type of works in question are highly complex. According to the Sixth Circuit in *Kohus v. John V. Mariol*, 328 F.3d 848, 857 (6th Cir. 2003):

> In cases where the target audience possesses specialized expertise, the specialist's perception of similarity may be much different from the lay observer's, and it is appropriate in such cases to consider similarity from the specialist's perspective.... Expert testimony will usually be

---

[23]   Richard Meier is a recipient of the Pritzker Prize for Architecture and numerous other awards. He has been a practicing architect for over 40 years, and has designed and has designed and built more than 100 projects worldwide. His notable work includes the Getty Center in Los Angeles, the Museum of Contemporary Art in Barcelona, and the Federal Courthouses in Islip, Long Island and Phoenix.

> necessary to educate the trier of fact in those elements for which the
> specialist will look. [citations omitted].

In recent years, courts and commentators alike have recognized that the propriety of and need for expert testimony on the issue of substantial similarity when dealing with complex technologies or other technical works, as the *Altai* Court expressly recognized in granting discretion to district courts "to decide to what extent, if any, expert opinion, regarding the highly technical nature of computer programs, is warranted in a given case." *Altai,* 982 F.2d at 713. Subsequent to *Altai,* numerous courts in this Circuit and elsewhere have admitted expert testimony in appropriate infringement actions. *See Nimmer* § 13.03[E][4], at 13-101 and cases cited at n. 269. *See also, Dawson*, 905 F.2d at 733 (liturgical music); *Gentieu v. Tony Stoneimages/Chicago, Inc.*, 255 F. Supp. 2d 838, 848 (N.D. Ill. 2003) (expert testimony allowed on the "total concept and feel" standard); *Susan Wakeen Dalco v. Ashton-Drake Galleries*, 272 F.3d 441, 441-42 (7th Cir. 2001) (photography).

There is no Second Circuit authority specifically addressing the issue of whether expert testimony is appropriate on the issue of substantial similarity in the case of an alleged infringement of an architectural work or, for that matter, an architectural plan; neither *Attia* nor *Sparaco* addressed this question.[24] However, under the above-cited authorities, common logic, and given the liberal standard for admissibility of expert testimony under F.R.E. Rule 702, reliance on expert testimony to assess substantial similarity in architectural works is wholly appropriate.

### E.   Applying the *Altai* Test

Assuming that both Olympic Tower and Freedom Tower are architectural works under the Act, Freedom Tower would only infringe Olympic Tower if protectible elements of the Olympic Tower design were incorporated into the Freedom Tower design. That is demonstrably not the case under the *Altai* test.

The complaint alleges that Freedom Tower "incorporates a structural grid which is identical to Shine's Olympic Tower: a symmetrical elongated, diagonal column grid which follows the surface

---

[24]     The D.C. Circuit raised but did answer this question in *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1300 (D.D.C. 2002).

created by the twisted facades, with grid ends meeting at the base and corners of the buildings,[25] with the grid span about ten floors between nodes and the structural grid expressed on the exterior of the building". Comp., ¶ 10. Further, it is alleged that "[t]he façade of [Freedom Tower] is also strikingly similar to Shine's Olympic Tower: a large, elongated, symmetrical diamond pattern, with the diamonds interlocking and protruding to create a curtain wall with a crenellated appearance". *Id.* These are the ***only*** allegations concerning similarities between Olympic Tower and Freedom Tower, and they are purportedly supported by an exhibit allegedly illustrating these similarities through a series of superimposed images of the two works. *Id.*, Ex. G.

As demonstrated below, Shine's description of the similarities between the two works is misleadingly presented.[26] More fundamentally, it rests on a complete misunderstanding of "substantial similarity" under the Act, because it is nothing more than an attempt to protect ideas – ideas that others have already expressed at that – and a combination of a few standard architectural elements. And even if Shine had protectible in his Olympic Tower, that something is not present in Freedom Tower.

### 1.    Abstraction

The highest level of abstraction for a design of a skyscraper is at the initial conceptual level: the primary form of the building. For a building such as the Empire State Building, this level might be described as a tower that includes setbacks as it rises. At a lower level of abstraction –including the basic proportions of the building, its main features, and a general description of exterior and interior structure – the Empire State Building could be described as a steel frame consisting of vertical columns and horizontal floor plates that are rectangular (and, again that set back as they rise), with an exterior primarily composed of stone, masonry, steel and glass. A yet lower level of abstraction would likely include the building's actual dimensions, the shape of any major exterior components, the shape of the

---

[25]    In some of Shine's models, the "grid ends" of Olympic Tower do not in fact meet at the corners of the building. *See* Durschinger Aff't, ¶ 22 (Model No. 3), ¶ 24 (Model No. 4).

[26]    Tellingly, although the complaint states that the images in Exhibit G compare Freedom Tower to "Plaintiff's Works" - defined to include both Shine 99 and Olympic Tower - only images of Olympic Tower are included in this Exhibit.

windows, and the location of major internal elements. Each of the above levels would be evident in early-stage conceptual drawings or models. As we move to even lower levels of abstraction, the design acquires more and more detail, until at the lowest level of abstraction, all details that might be shown in final construction blueprints or in the finished building would be included.

As cited above, there are typically four stages of architectural development beginning with the initial conceptual design phase. These stages appear to be the best objective markers for the abstraction analysis of architectural works. As Meier concludes, Olympic Tower is squarely within the conceptual design phase. Meier Aff't, ¶¶ 8. And plaintiff himself uses terms that suggest a very high level of abstraction: "a twisting tower with a symmetrical diagonal column grid, expressed on the exterior of the building, that follows the twisting surface created by the floor plates' geometry."[27] Comp., ¶ 10. Thus defined, Olympic Tower is so purely conceptual that it is hardly necessary to filter the unprotectible elements in order to reach the conclusion that there can be no infringement here. Even if the configuration of Shine's curtain wall or some other element could be said to constitute expression at a lower level of abstraction, once the functional or unoriginal elements are filtered, little remains.

### 2.    Filtration

As discussed at pp. 32 to 34 *supra* and in the Meier Aff't, a close examination of plaintiff's various Olympic Tower materials reveals that all of the elements he identifies are either functional or not original and therefore must be filtered out. We have already demonstrated that the following elements are functional or dictated by other external concerns: the structural diagrid, the entrance, the elevator core, and the curtain wall. Meier Aff't, ¶¶ 24-31; *supra* at pp. ___. *See Kootenia Homes*, 2002 U.S. Dist. LEXIS 235, at *12 (in context of houses, noting that "[e]fficiency concerns and the need for functional living in the home inevitably constrain the number of variations in the configuration of the rooms and spaces. (citation omitted) Common elements and generic features are shared by all homes"). Elements

---

[27]    The statutory protection for "overall form" cannot be applied at this high a level of abstraction, or Shine could, in the name of copyright protection, prevent a whole range of tapering, twisting buildings to be built.

that are not original also do not survive the filtration process. The Meier Aff't shows that all of the features of Shine's work have been borrowed from preexisting materials. Meier Aff't, ¶¶ 24-31; *supra* at pp. 31-35.

When all of the elements that are mere ideas, functional, or evident in prior art have been filtered out, it is difficult indeed to extract any "golden nugget" at all for the comparison portion of the analysis. Even allowing that that nugget can, in the context of architectural works, be a combination of elements, it is only Shine's particular and limited articulation of any such elements which can be subject to protection at all, *i.e.*, the particular shape, form and design of the structural diagrid (if that basic shape can be protected); the four-sided 90-degree rotation of the twisted sides; and the particular "basket-weave" design of his glass curtain wall. As we will see below in the comparison phase, none of these precise elements, whether protectible or not, and whether considered alone or in combination, appear in Freedom Tower.

### 3.    Comparison

The *Altai* test mandates that the Court compare the allegedly infringing work with the protectible elements left after the filtration analysis of the allegedly infringed work, but substantial differences between works also aid the analysis. *Attia*, 201 F.3d at 58; *Warner Bros.*, 720 F.2d at 241 ("numerous differences tend to undercut substantial similarity") (citation omitted); *Durham Indus. Inc. v. Tomy Corp.*, 630 F.2d 905, 913 (2d Cir. 1980) ("The more numerous the differences between two works the less likely it is that they will create the same aesthetic impact so that one will appear to have been appropriated from the other.")[28]  Given the finite ways in which common architectural elements can be arranged, courts examining house plans, for instance, have held that "modest dissimilarities are more significant than they may be in other types of art works". *Howard v. Sterchi*, 974 F.2d 1272, 1276 (11th Cir. 1992) (*citing Original Appalachian Artworks, Inc. v. Toy Loft*, 684 F.2d 821, 830 (11th Cir. 1982)). Below we address

---

[28]    *See also Kootenia Homes*, 2002 U.S. Dist. LEXIS 235, at *17; *John Alden Homes, Inc. v. Kangas*, 142 F. Supp. 2d 1338, 1345 (M.D. Fla. 2001).

first why those few arguably protectible similarities Shine identifies are illusory, and second, we identify the overwhelming differences between the designs.

### a.    The "Golden Nugget" of Olympic Tower

Shine's best case scenario is that his "golden nugget" is a combination of his particular expression of the twist, the supposed structural "diagrid", and the glass sheathing or façade. Of course, one naturally flows from the other: if the building twists, it is either necessary - or one of only a very limited number of choices - to triangulate the façade. Applying glass as a curtain wall is a standard or one of a few existing choices, and once the choice is made to recess the curtain wall behind exposed structural members, it by necessity follows the form of that structure. Assuming Shine can protect this combination notwithstanding functionality, standard features, and the limited number of and lack of detail concerning his choices, comparing those elements of Olympic Tower to those same elements of Freedom Tower reveals no substantial similarity of protectible expression.

*First*, Freedom Tower does <u>not</u> twist; the building's floor plates do not rotate at all but rather two sides of the floor plates move inward or are chamfered as the building rises. In comparison, <u>all</u> <u>four</u> of Olympic Tower's sides twist as the floor plates rotate. Meier Aff't, ¶¶ 33-34. As a result, the sides of each proposed tower take on wholly different geometric shapes than those of the other. Also, Meier notes that the eccentric rotation of Olympic Tower would give that form a "hunched" or bent profile, whereas Freedom Tower's profile is vertical. *Id.*

*Second*, Shine identifies the "symmetrical diagonal column grid" as a common element. But the expression of the diagonal grids in the respective works differs markedly. Freedom Tower has a structural column grid that is entirely encased within the building's outer sheathing. Meier Aff't, ¶ 39. (It also has a separate, non-structural "cladding" system that is applied to the exterior wall (the "curtain wall") which partially mimics the underlying diagonal structure). In contrast, Olympic Tower has a structural diagrid of totally different proportions (assuming that it is a diagrid even though the elements do not cross or even touch), that is exposed to the elements. *Id.*, 22, 39-40. In addition, the diagrids of necessity take different configurations as they "follow" (Shine's word) the very different geometries of

the forms at issue. As discussed above, the lack of detail in Shine's three-dimensional models (Olympic Tower Models 2, 3 and 4) and the inconsistencies between and among them, particularly when combined with a complete lack of scale and other details, make it impossible to determine even the precise width and height of the proposed building, much less the manner in which the diagrid would be applied (*id.*, ¶¶ 16, 39) and it is only through manipulation of images in Exhibit G that Shine makes them appear even superficially similar.

Assuming away the inconsistencies in Shine's work, the number of diagonal columns and therefore the number of diamond shapes across the width of the buildings clearly differ from Freedom Tower. *Compare* Olympic Tower Model 4 (six diamond shapes across and nine diamond shape from top to bottom), *with* Freedom Tower (10 diamond shapes across and 14 diamonds top to bottom)); *see also* Meier Aff't, ¶ 17-18. This means that even assuming the width and height of the buildings were the same – a gross assumption given Shine's lack of particularization – the width and height of the diamond shapes would, of necessity, be different. Meier Aff't, ¶ 38. *See Ale House Management*, 205 F.3d at 143 ("[Defendant's] floor plans are not in the same dimensions or proportions as any of those presented by [plaintiff]"); *Howard*, 974 F.2d at 1276 (comparing floor plans for houses, court found no substantial similarity; "although the floor plans are visually similar and the layout is generally the same, the dissimilarities are significant, particularly the roof lines, the bay window and the dimensions").

*Third*, the glass facade on both proposed buildings differs substantially. *Compare*, the faceted structure of the glass façade of Freedom Tower (Durschinger Aff't, Ex. P) to Olympic Tower's basketweave design (*id.*, Exs. F and G). In Olympic Tower, the plating "in-fills" between the columns, so that the actual structural columns project in front of the glass and are thus exposed on the surface of the building. Meier Aff't, ¶ 39. Assuming *arguendo* some superficial visual similarity between the combination of the exterior diagonal structural columns and in-filled glazing (on one side of Olympic Tower Model 1) on the one hand, and the non-structural "cladding" diagrid system used in Freedom Tower and its curtain wall on the other, the manner in which the glass panels are applied to the side of the building and integrated with the diagrids are completely different, resulting in a wholly different outward

form.  *Id.*, ¶¶ 39-40.  This difference would be even more glaringly apparent if incorporated in a constructed building.

As Meier explains, it is rank speculation at best as to how Shine's flat curtain wall – as shown in Model No. 1 – could physically be applied to a twisting building (Meier Aff't, ¶ 39).  One of Shine's other models (Model No. 2) appears to show large plates on several sides of the building that "weave" vertically – that is, the glass plates or other sheeting rise away from the plane of the building as they move towards the center of each large diamond shape, and fall back towards the plane of the building as they reach the points; hence Shine's claim that his hypothetical curtain wall "weaves" or is "crenellated". Meier Aff't, ¶ 40.  This paper model does little to illuminate Shine's idea, as it has no additional detail, so there is no indication as to whether this would work (or if it did, how it would look) in glass and steel.  In contrast, the far more advanced (and conceptually realizable) Freedom Tower design includes models that demonstrate exactly how its external cladding diagrid would be applied to the two warped surfaces and two flat surfaces.  Durschinger Aff't, Exs. O and P.  In fact, the glass cladding in the curtain wall in Freedom Tower create three-dimensional pyramidal shapes within the external diagrid on the warped sides of the building.  Meier Aff't, ¶ 40.  Rather than "weaving" in and out in brick fashion, the glass on Freedom Tower is faceted like a cut diamond, whereas the glass (or other sheathing) on Olympic Tower has the bi-planar peaks and valleys we see on a wicker basket.

Thus, there is no similarity in protectible expression in the articulation of these three elements, alone or in combination, in each of Olympic Tower and Freedom Tower.

### b.     The Higher Level of Articulation of Freedom Tower Shows Additional Dissimilarities

The design for Freedom Tower as of December 19, 2003 – although still in its schematic design stage in the context of professional architectural design (Meier Aff't, ¶ 32) – was overwhelmingly more detailed than Shine's design for Olympic Tower, rendering the identifiable differences between the two designs virtually too numerous to state, even just on the basis of the materials regarding Freedom Tower that were actually publicly displayed on December 19, 2003.  Durschinger Aff't, ¶¶ 35 to 42, Exs. N-R.

For instance, the three-dimensional transparent physical model displayed at the press conference was large enough – approximately eight feet tall – to show considerable detail with respect to the spire, the crown, the exposed structure housing the wind turbines and observation deck, the faceted outer skin of the building, the floor plates, the central core, the lobby, mezzanine and entrance. Add to this detail the fact that a vertical cross-section and floor plans of the building were also publicly presented at that time. *Id.*, ¶ 36 (cross-section reproduced on p. 35 of *Imagining Ground Zero: Official and Unofficial Proposals for the World Trade Center* Site. The latter show the perimeter structure, as well as the elevators and mechanical and life-safety elements within the central core. The vertical cross-section shows the connection to the PATH train system, the mechanical floors, observation deck, restaurant and event spaces as the top of the occupied portion of the building, the twin central masts, wind turbines, and cable and truss structure at the upper portion of the building, and the transmission facilities in the spire of the building. Also presented on December 19, 2003 were a series of photomontage renderings of the building as it might look in context, that demonstrate how the building might appear in shade and shadow, and how it might be reflected in sunlight and moonlight. *Id.*, Ex. R.

Visual examination of this collection of renderings readily shows that Freedom Tower has a wholly different "overall form" and combination of elements than Olympic Tower does. *See, e.g., Kootenia Homes*, 2002 U.S. Dist. LEXIS, at *17 (distinguishing between houses based on size of habitable space as well as overall size, roof lines, stair locations, number and configuration of windows, and juxtaposition and layout of rooms); *John Alden Homes*, 142 F. Supp. 2d at 1344 (no substantial similarity where there were differences in room sizes and shapes, differently angled walls, and location of rooms); *Walter Sedovic Architect, P.C. v. Alesandro*, 98 Civ. 2120, 1999 U.S. Dist. LEXIS 17443, at *7 (S.D.N.Y. Nov. 2, 1999) (Jones, J.) (despite fact that churches depicted in drawings were both in shape of a cross and had tall vertical structures marking the main entrances, two drawings held not substantially similar because defendant's drawing showed much smaller sized dome, different roof features, and an extra entrance); *Lajoie v. Pavcon, Inc.*, 146 F. Supp. 2d 1240, 1248 (M.D. Fla. 2000) (no substantial

similarity where homes differed in size, roof lines different, pool areas and verandas different, and one home had portico).

Thus, the substantial dissimilarities between the articulation of Freedom Tower and Olympic Tower reinforce the conclusion that the two are not substantially similar.

### F.    Applying the Statutory Definition/Compilation Theory

As noted above, the statute references "the design of a building", including its "overall form" and "the arrangement and composition of spaces and elements in the design", excluding "individual standard features" (discussed and excluded in the filtration analysis above).  This pre-*Feist* definition appears to endorse protection for a combination of protectible and/or unprotectible elements, so long as the combination itself demonstrates sufficient originality. *Feist*, 499 U.S. at 361.

Shine does not even allege that the "overall form" of Freedom Tower is substantially similar to Olympic Tower; rather, the complaint states that Freedom Tower's "overall form and shape is substantially similar to the form and shape of Shine 99".  Comp., ¶ 18  By almost any measure, Freedom Tower is wholly dissimilar to *both* of Shine's alleged designs in overall form as detailed above, except to the extent that all three purport to represent tall buildings that have at least two "warped" sides.  Any highly abstracted similarity in form that exists here flows from the *lack* of expressive detail in Shine's works, *i.e.*, they are so generalized and conceptual that they could resemble the basic form of <u>many</u> structures. *See generally Wickham v. Knoxville Int'l Energy Exposition, Inc.*, 739 F.2d 1094, 1096-97 (6th Cir. 1984) (in case involving architectural plans, affirming holding that "plaintiff seems to be asserting that he has the exclusive right to design and erect a tower with a spherical building on top of it.  The use of towers in architectural designs is certainly not unique . . . Likewise the incorporation of a spherical structure into the design is no more than an 'idea'").

It is difficult to determine what "arrangements or spaces and elements in the design" Shine could even theoretically protect.  The references in the legislative history of the AWCPA to protection for "interior architecture" suggest that floor plans, if sufficiently detailed, could themselves constitute a

protectible element of an architectural design. But, Shine's interior "design" materials consist of a single page with small drawings of what appear to be 11 floor plates for his proposed design. Comp., Ex. B, p. 7. Meier speculates that these drawings may show a "central elevator core" that passes through each floor. Meier Aff't, ¶ 16. If so, this may be a very preliminary attempt to begin conceptualizing the interior architecture, but the location and shape of this presumed elevator core differs entirely from location and shape of the elevator core(s) in Freedom Tower. Durschinger Aff't, Exs. S-1, S-2. Also, since the shape of the floor plates themselves differ from those in Freedom Tower, the resulting interior spaces are necessarily entirely different. Meier Aff't, ¶¶ 33-34.

The most complex "arrangement" of elements in the design of Olympic Tower charitably construed is four twisting sides rotating 90 degrees around an eccentric axis; a structural diagrid (of an undetermined number of columns and of unspecified height); with glass glazing between the exposed columns; an aperture; and an elevator core. Regardless of whether this arrangement is viewed in its entirety or in smaller units of combined elements, given the "thin" protection accorded a compilation which only protects against exact copying, the fact is that Freedom Tower does not duplicate any such arrangement at all, much less exactly. *See National Medical Care,* 284 F. Supp. 2d at 436 (technical drawings showing of arrangement of unprotectible elements subject to only thin protection, and not infringed by "as-built" structures whose details vary).

### G.    Applying the Total Concept and Feel Test

There is yet another test for substantial similarity, traditionally used to evaluate non-literal similarity in cases involving narrative works and relatively simple visual designs, known as "total concept and feel". *Reyher v. Children's Television Workshop,* 533 F.2d 87, 91 (2d Cir. 1976).[29]  Whereas the

---

[29]     *Reyher* involved simple children's books, so the sequence of events was inevitable and it was appropriate to consider total concept and feel. Cases involving other kinds of works have followed this reasoning. *See, e.g., Sid & Marty Krofft Television Productions v. McDonald's Corp.,* 562 F.2d 1157 (9th Cir. 1977) (juvenile games); *Broderbund Software v. Unison World Inc.,* 648 F. Supp. 1127 (N.D. Cal. 1986) (computer programs); *Three Boys Music Corp. v. Michael Bolton,* 212 F.3d 477 (9th Cir. 1999) (music); *Atari, Inc. v. Amusement World, Inc.,* 547 F. Supp. 222 (D. Md. 1981) (video games).

Of the dozens of cases involving the issue of substantial similarity heard by the Second

*Altai* test focuses in on protectible details of the allegedly infringed work, and the statutory definition

includes also selection, order and arrangement of elements in the allegedly infringed work, the total

concept and feel test looks more broadly at both the allegedly infringed and infringing works as a whole,

so that not only are all elements of the allegedly infringed work considered, but they are compared to the

entirety of the allegedly infringing work. *Boisson v. American Country Quilts & Linens, Inc. v. Banian,*

*Ltd.*, 273 F.3d 262, 273 (2d Cir. 2001) (considering "arrangement of the whole" in comparing plaintiffs'

quilts with defendants under total concept and feel test); *Nihon Keizai Shimbun*, 1998 U.S. Dist LEXIS

6806 at *22 (S.D.N.Y. Apr. 14, 1998) (Cote, J.) ("the works as a whole must be compared to each other"),

*aff'd*, 66 F. 3d 65 (2d Cir. 1999).  In this case, the latter would include all aspects of the Freedom Tower

design as of December 19, 2003.

The most recent Second Circuit decision addressing the total concept and feel test, *Tufenkian*,

explains that it was designed as a method of addressing non-literal or "inexact" copying as a "necessary

result of the Supreme Court's statement in *Feist* . . . that compilations of unprotectible elements merit

copyright protection insofar as they contain an original and non-mechanical selection, coordination or

arrangement of those elements", and notes the severe criticism of the test by *Nimmer* and others.  338

F.3d at 133-34 (citations omitted).[30]  The *Tufenkian Court* said of this test:

---

Circuit since 1976, in only 12 instances has the Court found it appropriate to apply the "total concept and
feel" analysis.  Seven of those cases have involved textile or graphic designs, *Tufenkian Import/Export
Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127 (rugs); *Boisson*, 273 F.3d 262 (quilts); *Yurman
Design, Inc. v. PAJ, Inc.*, 262 F.3d 101 (2d Cir. 2001) (jewelry); *Hamil Am., Inc., v. GFI*, 193 F.3d 92 (2d
Cir. 1999) (floral pattern); *Streetwise Maps, Inc. v. Vandam, Inc.*, 159 F.3d 739 (2d Cir. 1998) (street
maps); *Knitwaves, Inc. v. Lollytogs LTD. (Inc.)*, 71 F.3d 996 (2d Cir. 1995) (sweater designs); *Eden Toys,
Inc. v. Marshall Field & Co.*, 675 F.2d 498 (2d Cir. 1982) (toy snowmen). Five have involved literary
narratives.  *Williams v. Crichton*, 84 F.3d 581 (2d Cir. 1996) (children's stories); *Walker v. Time Life
Films, Inc.*, 784 F.2d 44 (2d Cir. 1986) (non-fiction book); *Warner Bros. Inc. v. Am. Broad. Cos., Inc.*,
720 F.2d 231 (2d Cir. 1983) (story of Superman); *Reyher v. Children's Television Workshop*, 583 F.2d 87
(2d. Cir. 1976) (children's story).  Judge Preska has observed that "the few decisions in which the Court
of Appeals has found liability based on a 'look and feel' argument all involved infringement of visual
designs of a single static artistic work. . . . [and] [i]n each instance the defendants actually copied the
plaintiff's design and similarities between the plaintiff's and defendant's work were overwhelming".  *CBS
Broadcasting*, 2003 U.S. Dist. LEXIS 20258, at *15-16.

[30]     *See* 4 *Nimmer* § 13.03[A][1][c], at 13-46.  ("More broadly, the touchstone of 'total
concept and feel' threatens to subvert the very essence of copyright, namely the protection of original

[One] may wonder whether a copyright action whose aspiration is to protect a work's "concept" could end up erroneously protecting "ideas". But our case law is not so impartial. Where we have described possible infringement in terms of where the two designs have or do not have a substantially similar "total concept in field", we generally have taken care to identify precisely the particular aesthetic decisions -- original to the plaintiff and copied by the defendant -- that might be thought to make the design similar in the aggregate. . . .

. . . The court, confronted with an allegedly infringing work, must analyze the two works closely to figure out in what respects, if any, they are similar, and then determine whether these similarities are due to protected aesthetic expressions original to the allegedly infringed work, or whether the similarity is to something in the original that is free for the taking.

338 F.3d at 134-35.

Under these authorities, the total concept and feel test should be applied cautiously and limited to cases involving works that lend themselves to uncomplicated comparisons; otherwise there is a serious risk that unprotectible elements will be protected. *See generally Nimmer*, § 13.03[A][1][c], at 13-45 (total concept and feel test "is geared towards simplistic works that require only a highly 'intrinsic' (*i.e.*, unanalytical) evaluation"). Where, as here, the type of work in question is complex and technical, but plaintiff's design for it is merely conceptual, the total concept and feel test risks glossing over the absence of expression and/or protectible elements. Nonetheless, because a few courts outside the Second Circuit have applied this test to architectural works,[31] we demonstrate briefly below that, even under this test, Shine's infringement claim fails as a matter of law.

The analyses previously undertaken demonstrate the absence of substantial similarity of protectible expression either at the level of individual elements, some combination thereof, or the building's form. To the extent total concept and feel assesses something more, it must include all of the

expression." (emphasis in original)); *Procter & Gamble,* 1998 U.S. Dist. LEXIS 17773 at *104; *Robinson v. Viacom Int'l*, 93 Civ. 2539, 1995 U.S. Dist. LEXIS 9781, at *28 (S.D.N.Y. July 13, 1995) (overbroad application of test threatens basic principles of copyright); *CK Co. v. Burger King.*, 1994 U.S. Dist. LEXIS 13934, at *8-9 (S.D.N.Y. 1994) ("Accepting an overly broad scope for protectable "total concept and feel" threatens the basic principle of copyright law: that concepts and ideas may not be copyrighted, and that only a particular expression of an idea may be copyrighted").

[31]     *Sturdza* is the lone appellate decision applying total concept and feel to architectural works, but it did so without explicating why it was applied or whether it should be. 281 F.3d at 1299.

elements of each of the works being compared.[32] *Nihon Keizai Shimbun*, 1998 U.S. Dist. LEXIS 6806, at *23. We have already described all of the elements of Shine's works, and the paucity of them. Assuming for these purposes a combination that rises to the level of a design for a building, Olympic Tower consists entirely of elements for the shaft or body of the proposed building. In contrast, the total concept and feel of Freedom Tower consists not only of the shape of its "shaft" or middle – which is the only portion even alleged to be similar to Shine 99 and Olympic Tower – but by all of the other architectural features of SOM's design including the spire cable and truss structures and crown, the twin central masts, the wind turbines, the diagrid expressed in the curtain wall, and the recessed glass lobby wall and arcade at the ground floor, in addition to a wealth of detail which would be meaningful only to the trained eye, *i.e.*, architects, structural engineers and the like involved in the continuing design process and implementation.

As Meier explains, architecture of tall buildings is typically "read" from the top and bottom – that is, the design elements at the top of the structure and where the building meets the ground (including the entrance) are the components of "overall form" that are primarily noted by the ordinary lay observer. Meier Aff't, ¶ 9. This follows logically from the fact that most skyscrapers are built in densely populated cities, where the top portion of the building that is seen from a distance (if it rises high enough), but it is the bottom portion is seen by people at street level. *See generally id.*, ¶¶ 9-10. Olympic Tower has none of the features of Freedom Tower's overall form save for a differently articulated facade in the case of Olympic Tower which, as discussed above, differs significantly from Freedom Tower's facade. So even

---

[32]     This is especially true for three-dimensional works. In resolving the tension between the time honored proposition that "no plagiarist can excuse the wrong by showing how much of his work he did not pirate" (*Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 56 (2d Cir.), *cert. denied*, 298 U.S. 669 (1936) on the one hand and the idea that "a defendant may legitimately avoid infringement by intentionally making sufficient changes in a work which would otherwise be regarded as substantially similar to that of the plaintiff" (3 *Nimmer* § 13.03 [B] at 13-38.1 to 38.2), Judge Newman in *Warner Bros. Inc. v. American Broadcasting Companies Inc.*, 720 F.2d 231, 241 (2d Cir. 1983), stated as follows: "The tension between these two propositions perhaps results from the formulation in the context of literary works and their subsequence application to graphic and three-dimensional works. A story has a linear dimension: it begins, continues, and ends. If a defendant copies substantial portions of a plaintiff's sequence of events, he does not escape infringement by adding original episodes somewhere along the line. A graphic or three-dimensional work is created to be perceived as an entirety. Significant dissimilarities between two works of this sort inevitably lessens similarity that would otherwise exist between the total perceptions of the two works".

under the total concept and feel test and regardless of the audience, there is an overwhelmingly lack of substantial similarity here.

## CONCLUSION

For the foregoing reasons, judgment should be entered in favor of defendants dismissing the complaint with prejudice and awarding them prevailing party attorneys' fees in an amount to be determined.

Dated: New York, New York
       March 25, 2005

Respectfully submitted,

FLEMMING, ZULACK & WILLIAMSON, LLP

By: _Richard A. Williamson /GAO_
       Richard A. Williamson (RW-3033)
One Liberty Plaza
New York, New York  10006-1404
(212) 412-9500

DAVIS WRIGHT TREMAINE LLP

By: _Marcia B. Paul /jq_
       Marcia B. Paul (MBP-8427)

1633 Broadway
New York, New York 10019
(212) 489-8230

Attorneys for Defendants

Of Counsel:
    Richard A. Williamson
    Marcia B. Paul
    Elizabeth A. O'Connor
    Lacey H. Koonce