**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

**THOMAS SHINE,**                                    :
                                                     :
                        **Plaintiff,**               :
                                                     :          **04 CV 8828  (MBM) (RLE)**
            **- against -**                          :
                                                     :
**DAVID M. CHILDS and SKIDMORE,**                    :
**OWINGS & MERRILL LLP,**                            :
                                                     :
                        **Defendants.**              :

------------------------------------------------------------ x


# <u>DEFENDANTS' REPLY MEMORANDUM</u>


FLEMMING, ZULACK & WILLIAMSON, LLP
One Liberty Plaza
New York, New York  10006-1404
(212) 412-9500

DAVIS WRIGHT TREMAINE LLP
1633 Broadway, 27th Floor
New York, New York 10019-4315
(212) 489-8230

Attorneys for Defendants David M. Childs
And Skidmore, Owings & Merrill LLP

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

ARGUMENT ................................................................................................................. 2

1.  Shine Effectively Concedes That He Has No Infringement Claim On Shine 99 .......... 2

2.  Since Shine Concedes That Shine 99 Has An Entirely Different Overall Form Than Olympic Tower And Claims That It Has The Same Form As Freedom Tower, Perforce Olympic Tower Has An Entirely Different Overall Form Than Freedom Tower .................................................................................................. 3

3.  Shine Claims No Protection For Olympic Tower As A Series of Architectural Plans .................................................................................................................. 4

4.  Shine Limits His Claim For Protection To His Deposit Materials ................................. 4

5.  Shine Offers No Competing Definition For The Statutory Term "Architectural Work" .................................................................................................................. 5

6.  Shine Concedes That An Architectural Work Must Have A Unitary Design And Concedes The Design Inconsistencies In His Olympic Tower Materials .............. 6

7.  Shine Effectively Concedes That None Of His Individual Design Elements Are Original And Therefore Predicates His Claim Upon A Combination Of Elements .............................................................................................................. 8

8.  Shine's Concession That Expert Evidence Is Appropriate On The Issue Of Substantial Similarity Is Inconsistent With His Reliance On The Ordinary Observer Test ...................................................................................................... 10

9.  Shine Offers No Explanation As To Why Abstraction Is Not The Appropriate Test And Why Total Concept And Feel Should Govern ............................................. 11

10.  Shine Totally Fails To Compare The Two Works As A Whole .................................. 11

11.  Shine Never Actually Addresses The Expression Of The Identified And Allegedly Substantially Similar Features In Freedom Tower ...................................... 13

12.  Shine Tries to Manufacture Similarity By Manipulating His Comparisons ................. 13

13.  Shine Effectively Concedes That The Alleged Similarities Are Similarities In Ideas, Not Expression ...................................................................................... 16

CONCLUSION ............................................................................................................. 24

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Attia v. Society of the New York Hospital*, 201 F.3d 50 (2d Cir. 1999) ............................................8

*Perma Research & Development Co. v. Singer Co.*, 410 F.2d 572 (2d Cir. 1969) .......................9

*Quiroga v. Hasbro, Inc.*, 934 F.2d 497 (3d Cir. 1991) ................................................................8

*Sparaco v. Lawler, Matusky, Skelly Eng'rs*, 303 F.3d 460 (2d Cir. 2002),
    (Init. Memo at 15-16)..........................................................................................................8

*U.S. v. Scop*, 846 F.2d 135 (2d. Cir. 1988) ................................................................................10

*Rottlund Co., Inc. v. Pinnacle Corp.*, 2004 WL. 1879983 (D.Minn. Aug 20, 2004) ...................10

## FEDERAL STATUTES

17 U.S.C. § 101................................................................................................................5, 21

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x

**THOMAS SHINE,**                  :

                        **Plaintiff,**        :

                 - against -        :       **04 CV 8828  (MBM) (RLE)**

                                          :

**DAVID M. CHILDS and SKIDMORE,**    :
**OWINGS & MERRILL LLP,**           :

                                        :

                       **Defendants.**     :

-------------------------------------------------------- x

## DEFENDANTS' REPLY MEMORANDUM

Plaintiff Thomas Shine ("Shine") has finally delivered the long-ago requested particularization of his claims of copyright infringement based upon two purported architectural works, "Shine 99" and "Olympic Tower".  That particularization demonstrates that, in this case, more is less.  His attempts at expanding the allegations of his skeletal complaint only succeed in highlighting that neither Shine 99 nor Olympic Tower is an architectural work as statutorily defined, and that neither has been infringed by the display on December 19, 2003 by defendants David M. Childs and Skidmore, Owings & Merrill LLP (collectively, "SOM") of certain models, designs and plans for Freedom Tower.

Although Shine continues to pay lip service to the viability of his claim for copyright infringement based on Shine 99, he effectively concedes that it  must be dismissed.  Shine makes more of an effort but fares no better on his claim with respect to Olympic Tower.  Because Shine maintains both that (i) Shine 99 and Olympic Tower have totally different forms; and (ii) the form of Freedom Tower is substantially similar to the form of Shine 99; ergo, (iii) he must necessarily admit that the form of Olympic Tower is wholly different from the form of Freedom Tower.  Under any test for substantial similarity – particularly the "total concept and feel" analysis that Shine urges

– this concession should end the Court's analysis.  How can two buildings with completely different shapes be substantially similar?

Shine virtually concedes what defendants' expert, Richard Meier, has already established: none of the individual elements of Olympic Tower, as articulated in Shine's various, sundry and inconsistent models and drawings, is original.  Consequently, Shine falls all over himself to label the three elements that he claims defendants copied in as many different ways as possible, so as to lay claim to enough individual elements to have a viable claim based on a combination of them.  The more Shine tries to articulate different elements in Olympic Tower, the more evident it is that there is no substantial similarity between that design and the design of Freedom Tower.  Shine concedes that the two have different overall forms, different façades, and different exterior and interior structures and elements.  No amount of deceptive manipulation of comparative drawings – and an unconscionable amount of it has occurred here as detailed below – can obscure those glaring differences.

We briefly demonstrate below and in the accompanying affidavits[1] that regardless of the definition of "architectural work" and regardless of the test applied to determine substantial similarity, Shine's concessions and omissions lay bare the deficiencies in his claims and the complaint should therefore be dismissed.

**ARGUMENT**

**1.       Shine Effectively Concedes That He Has No Infringement Claim On Shine 99**

It is difficult to imagine a less vigorous defense than Shine proffers for his claim of copyright infringement with respect to Shine 99.  Tellingly, Shine's proffered expert, Professor James Axley, does not opine about Shine 99 at all.  Declaration of James Axley dated April 26,

---

[1]  Affidavits of John P. Durschinger and Lacy H. Koonce, III, each sworn to May 20, 2005 ("Durschinger Reply Aff't" and "Koonce Aff't", respectively).

2005 ("Axley Decl."), ¶ 5.  Left to his own devices, Shine argues in essence that Shine 99 is an original shape and that his creation of that shape precludes any member of the architectural community from ever designing a building that duplicates (or is substantially similar to) this form. Plaintiff's Memorandum in Opposition ("Opp. Memo") at 22-23.  Without any further explication, he continues to maintain with an apparent straight face that Freedom Tower has a substantially similar form, notwithstanding that it lacks the one distinctive feature of Shine 99, its setbacks.  Opp. Memo at 25, 29.

Pushing the envelope beyond advocacy, Shine tries to render the setbacks irrelevant by now claiming for the first time that his single model for Shine 99 is not one but *two* alternative "designs for a building" – one with setbacks and one without.  Declaration of Thomas Shine dated April 28, 2005 ("Shine Decl."),  ¶ 18 (setbacks "intended as an alternative approach to the form of the twisting sides"); Opp. Memo at 22-23.  This inherently incredible claim appears nowhere on the model itself, or in Shine's copyright registration, or in the complaint.  It is but a transparent effort to manufacture some minimal similarity between Shine 99 and Freedom Tower where none exists. Because Shine does not rebut, and thus concedes, defendants' argument that a comparison between Freedom Tower and his model as it exists and *in its entirety* (*i.e.*, including setbacks) shows that the two works are not substantially similar (Init. Memo at 27-28, 47-57),[2] his makeweight claim of copyright infringement of Shine 99 must be dismissed.

**2.  Since Shine Concedes That Shine 99 Has An Entirely Different Overall Form Than Olympic Tower And Claims That It Has The Same Form As Freedom Tower, Perforce Olympic Tower Has An Entirely Different Overall Form Than Freedom Tower**

Shine concedes that whatever the form of Shine 99, it was never intended to be a part of or combined with Olympic Tower.  Shine Decl., ¶ 20.  As he explains, Olympic Tower and Shine 99

---

[2]  With or without the setbacks, Shine 99 does not qualify for protection as an architectural work, for all of the reasons set forth in defendants' initial supporting memorandum ("Init. Memo") at 27-28.

do not share the same form because in Olympic Tower "all four sides twist, off center" (*id.*) and in Shine 99 only two sides twist (*id.*, ¶ 18).  In fact, no sides on Freedom Tower twist as a result of rotation of floor plates as in Olympic Tower; rather two of them are "chamfered", giving the impression of a twist.  Affidavit of Richard Meier, sworn to Mar. 25, 2005 ("Meier Aff't"), ¶¶ 33-34; Init. Memo at 48).  But even by plaintiff's reckoning, only two of Freedom Tower's sides "twist", not four as in Olympic Tower.  Shine Decl., ¶ 21(a).  Freedom Tower also does not rotate "off center" as does Olympic Tower, but rather has a centrally aligned core.  Meier Aff't, ¶¶ 34, 36; Affidavit of John P. Durschinger, sworn to Mar. 25, 2005 ("Durschinger Aff't"), Ex. S.  By simple logic, the form of Freedom Tower cannot be identical to the form of Olympic Tower as well as Shine 99, given that Shine concedes that the forms of Shine 99 and Olympic Tower are totally different.

### 3. Shine Claims No Protection For Olympic Tower As A Series of Architectural Plans

Shine confirms that he has not registered his Olympic Tower materials as pictorial, graphic or sculptural works ("PGS works") and does not base his claims for protection of those materials as PGS works.  Opp. Memo at 12-19.  Accordingly, the Court need not determine whether the individual models and drawings Shine claims comprise the "design of a building" are independently copyrightable as architectural plans and, if so, whether they have been infringed by depictions of Freedom Tower publicly displayed on December 19, 2003.

### 4. Shine Limits His Claim For Protection To His Deposit Materials

We now know precisely what materials Shine relies upon to support entitlement to protection for the design for Olympic Tower as a supposed architectural work.  He says that although he has additional materials related to Olympic Tower that were not deposited with his copyright application, none of them adds to the mix, as none discloses elements that are not also present in the materials he did include.  Shine Decl., ¶ 9; Opp. Mem. at 3-7.  Therefore, according to

Shine, the Court's analysis of whether he has enough to constitute an architectural work should focus exclusively on his deposit materials.

Defendants agree that Shine's additional materials add no further relevant detail. However, his deposit materials are but representations of certain of his actual models, including photographs or a photomontage of three-dimensional models, and the Court must consider the actual models on which these representations are based, else inconsistencies not obvious might be overlooked.  Init. Memo at 3-5, 29-31.  (If the Court so desires, defendants stand ready to make their physical models available for viewing and assessment at the Court's convenience.)

    **5.**      **Shine Offers No Competing Definition For The Statutory Term "Architectural Work"**

As demonstrated in defendants' moving papers, Shine's various materials do not suffice to constitute an architectural work.  In response to defendants' explication of the history of the AWCPA and the rationale for protecting architectural works separately from PGS works (Init. Memo at 11-20), plaintiff states only that the standard for originality for architectural works is no higher than for other works, and that the statutory definition of architectural works does not itself state that a building design must be buildable in order to be protected (Opp. Memo at 12-14).  These rather obvious points are no doubt true as far as they go, but neither answers the predicate question of what constitutes a "design of a building".

Shine never answers that question or explains how an architectural work differs from an architectural plan or model protected as a PGS work.  Under Shine's theory, presumably one merely has to label something (or a collection of somethings) a "design" and claim that either the components or the combination of them are original, in order to qualify for protection as an architectural work.  If that were all that is required, the protection historically afforded PGS works would be sufficient to protect those components – alone and in combination – and the AWCPA was wholly superfluous legislation.

Rather than offering his own view of what the statutory definition means, Shine engages in a completely irrelevant comparative analysis, designed to demonstrate that Olympic Tower is as fully developed as, and contains no greater inconsistencies than, the Freedom Tower materials presented in December 2003.  Opp. Memo at 8-9, 15; Shine Decl., ¶ 23.  Even if this were true (and it is not[3]), the only relevant question is whether Olympic Tower is an architectural work; whether or not the Freedom Tower design as of December 2003 qualifies is besides the point.

6.     **Shine Concedes That An Architectural Work Must Have A Unitary Design And Concedes The Design Inconsistencies In His Olympic Tower Materials**

Plaintiff tries to explain away the now-admitted inconsistencies in design in his various models and drawings, by characterizing them as common at early stages of the design process, including the schematic design level.[4]  Axley Decl., ¶ 19; Opp. Mem. At 15.  Whether common or not, it is only resolution of these inconsistencies that creates a unitary building design that can be protected as an architectural work, as even plaintiff implicitly concedes.  If this were not the case, the scope of copyright protection for a building design would actually be *broader* for an unfinished design than it would be for a final, unitary one: that is, the former would protect an unlimited number of different possible ultimately finished designs.  The perils of this proposition are aptly demonstrated by Shine's own absurd contention that the registration of Shine 99 with the Copyright Office as an architectural work, effectively blocks all architects from designing any building that has that same or a substantially similar form.

In an effort to connect the dots, Shine elevates his "large paper model" into a "coordinating

---

[3]  *See* Init. Memo at 50-51; Durschinger Aff't, ¶¶ 34-41, Exs. N-R.

[4]  Shine hones in on the term "schematic design" – which, as noted by defendants' expert, describes a typical phase in the architectural development of a building – and strives mightily to prove that Olympic Tower is, in fact, a schematic design.  Opp. Memo at 14-15.  This inquiry is of course equally irrelevant; the only germane question is whether Olympic Tower is an "architectural work" under the Act.  Even if experts can differ as to whether a particular project has technically passed from one phase of development to another from an architectural standpoint, it is the Act that controls.  Likewise, Shine notes that his work was well-received at his final exam, but it is in the courtroom not the classroom where the question of whether Shine's

drawing" that unifies his other disparate models and drawings (an argument Professor Axley neither makes nor echoes).  Shine Decl. ¶ 14; Opp. Memo at 4, 14.  This claim is implausible on its face, as this model consists of little more than the overall shape, with the suggestion of entrances on two sides, and a basket-weave of diamonds on several sides.  Shine asks the Court to extrapolate from this grossly generalized model and to imagine the other elements of his purported "design", by viewing the model "in conjunction" with the other materials.  Opp. Memo at 14.  How can this model conceivably act as a "coordinating drawing" if it offers no guidance as to how the other materials fit together, especially in light of the conceded inconsistencies?  *See* Init. Memo at 3-5, 29, 49-50 (discussing inconsistencies).  By way of example, this model says nothing of scale. While Professor Axley blithely concludes that Shine's materials are "to scale" and that "dimensions of height and floor size can be estimated to a reasonable degree of certainty" (Axley Decl., ¶ 19), neither he nor Shine tell us exactly what scales were in fact used on each model or drawing or the *relative* scales of them.  And it is clear that whatever the scale, it is different on Shine's different models and drawings.  *Compare* Shine Supp. Decl., Ex. A (floor plans) *with* Comp., Ex. B., P. 2 (large paper model); *see also* Durschinger Aff't, ¶¶ 15-30 (describing sizes of plaintiff's models). The only indication of an *actual* scale of any sort for Olympic Tower is found in the site plan (Shine Decl., Ex. B, p. 2), which Shine did not include in either his copyright registration or his complaint, and by his own account, is not part of his design.  Shine Decl., ¶ 9; Opp. Memo at 7.

With scale as with a host of other critical design elements, Shine essentially asks the Court to read a number of significant assumptions into the "design" of Olympic Tower that are not expressed at all in his materials.  He admits as much by claiming that his materials would provide an architect enough information to "move the design forward to the complex design development stage", at which time that same hypothetical experienced architect could develop a "clear,

---

materials constitute an architectural work for legal purposes will be decided.

coordinated description of all aspects of the design".   Opp. Memo at 14-15.   Shine's expert Professor Axley does not even go that far:  he opines only that "it is *likely* that this building could be built and would be structurally sound *if* subjected to the rigors of the Design Development Phase of building design".   Axley Decl., ¶ 20 (emphases added).   The facts are, of course, that neither Shine nor Professor Axley even claims to be a licensed architect and Olympic Tower has *not* been subjected to those rigors or been further developed by anyone else.

Neither Shine's particularization, nor his confession that not all of the detail visible on his "seven foot long" floor plan is visible from the exhibits to either his copyright registration or his complaint (Shine Decl., ¶ 8), changes the fact that on the continuum from purely conceptual preliminary plans on the one hand to fully realizable plans from which a building could be built on the other, Shine's Olympic Tower submissions fall far closer to the former than the latter  and, for this reason as well, do not qualify as an "architectural work" under the Copyright Act.[5]

### 7. Shine Effectively Concedes That None Of His Individual Design Elements Are Original And Therefore Predicates His Claim Upon A Combination Of Elements

Shine has now effectively conceded that he is really seeking copyright protection for a combination of elements.   Granted, he views three individual elements as having "apparent novelty"[6]: the "Shine Grid", the "Shine Grid used to support a twisting tower",[7] and the "pattern of

---

[5]   Similarly, on this continuum for architectural plans (not works) as established by the Second Circuit in *Attia v. Society of the New York Hosp.*, 201 F.3d  50 (2d Cir. 1999) and *Sparaco v. Lawler, Matusky, Skelly Eng'rs*, 303 F.3d 460 (2d Cir. 2002), (Init. Memo at 15-16), Olympic Tower falls far closer to the rudimentary, unprotectible site plan in *Attia* than to the far more detailed, protectible plan in *Sparaco*, as evident from the plans actually at issue in those cases.  Koonce Aff't, Exs. A and B.

[6]   Professor Axley peppers his opinions with the word "apparently" and like equivocations.  Axley Decl., ¶ 10 ("diamonds *appear* identical in size"; "uniform elongated diamond pattern results from the *apparent* equal spacing"; "*apparently* equal spacing"); ¶ 11 ("*possibly* Russia Tower which *appears* to have four primary horizontal belts"); ¶ 15 (Shine discovered "an *apparent*, practical, efficient and attractive structural support design"; ¶ 20 ("as a schematic proposal it is *likely* that this building could be built").  It is plaintiff's burden to demonstrate a disputed issue of material fact here, and Axley's equivocal, qualified opinions by definition cannot serve to do so.  *See Quiroga v. Hasbro, Inc.,* 934 F.2d 497, 500 (3d Cir. 1991) (plaintiff "must set forth specific facts showing a genuine issue for trial and may not rest upon mere allegations,

undulation in the façade".  Opp. Memo at 16.  But he hedges his claim to originality and says these features are "unusual, if not novel elements" (*id.* at 9); and he describes Olympic Tower as having "striking, if not novel features" (*id.* at 20); but never once does he use the word "original" with respect to any given element, rather than the combination of them.  Consistent with that careful choice of words, Shine does not contest the fact that SOM itself developed plans for a perimeter diagrid without horizontal or vertical supports long before 1999, in connection with a proposed building in Russia cited by Richard Meier.  Durschinger Reply Aff't, ¶ 12; Meier Aff't, Ex. F, pp. 4-6[8]; *see also* Durschinger Reply Aff't, ¶ 13 and Ex. K (example of similar structural system in Norman Foster building).

Likewise, Shine and Axley speculate that the support system and pattern of undulation on the Olympic Tower façade that Shine had in mind *might* be "unusual" (Shine Decl., ¶ 16; Axley Decl., ¶¶ 11-13, 15, 18), but they provide no counter to defendants' showing that diagrids have been applied to non-planar surfaces previously, including notably the I.M. Pei tower proposed for Grand Central Terminal in the 1950s (Meier Aff't, Ex. E, p. 2; *see also* Durschinger Reply Aff't, ¶ 12 and Ex. J) (Norman Foster tower proposed in the 1980s)), and that there are several similar undulating

---

general denials, or . . . vague statements"); *Perma Research & Development Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969) ("Summary judgment cannot be defeated by the vague hope something may turn up at trial").

[7]   Shine's contrived description (and labeling) of the "Shine Grid" is misleading as Shine and Axley implicitly concede, because in fact Olympic Tower has a horizontal support structure, *i.e.* the floor plates, and a vertical support structure, *i.e.* the elevator cores.  Shine Decl. ¶ 12; Axley Decl., ¶ 20.

[8]   Professor Axley claims to be an expert on architecture (although he is not a licensed architect and, as appears from his resume, has never designed a tall building), but he clearly is not an expert on copyright law. He seems to think that in order for an earlier architectural design to render Shine's own not original, the earlier design actually must have been built.  Axley Decl., ¶ 15.  This is not only ironic in light of Shine's claim to copyright protection for his own unbuilt designs, it also belies a fundamental misunderstanding of copyright law:  although whether or not an earlier work has been published may be relevant to access, it has nothing whatsoever to do with originality.  And in the case of architectural plans, they may well have been published (as most if not all of those Meier cites have been), even if never built.  Similarly, Professor Axley deems irrelevant all buildings designed or built after 1999 (*id.,* ¶¶ 13, 15, 17), but although irrelevant with respect to the originality of Shine's work, such buildings are certainly relevant to show elements that had become "standard" in the architectural vernacular or "stock" elements in copyright parlance as of December

façades, such as Frank Lloyd Wright's Beth Shalom Synagogue (Meier Aff't, ¶¶ 28-30, Exs. H-J).

Because he concedes the lack of originality in the individual elements of Olympic Tower, Shine logically must also concede, as he does, that his only protection for that design rests, if at all, in the "*combination* of elements which make up Olympic Tower".  Opp. Memo at 18.

> **8.  Shine's Concession That Expert Evidence Is Appropriate On The Issue Of Substantial Similarity Is Inconsistent With His Reliance On The Ordinary Observer Test**

Shine posits that a lay observer is the appropriate observer to determine substantial similarity in this case because "the end result is designed to be perceived and experienced by ordinary people who see it and use it every day".  Opp. Memo at 28.  The problem is that neither building has been built; both exist only as articulated in plans and models.  Shine would like the Court to find that Olympic Tower is a design for a building based solely on models and drawings that are not coordinated and do not even have a scale indicated, yet expects a lay observer to be able to "read" all of these pieces together and imagine a finished building, and then do the same for Freedom Tower, and compare them.  Shine's concession that expert opinions on the issue of substantial similarity are appropriate here (Opp. Memo at 30) is fundamentally at odds with his reliance upon a lay observer test, because the Court's analysis will be informed by expert perspective.[9]

---

2003, when Freedom Tower was presented to the public.

[9]  Indeed, Shine not only offers expert testimony relevant to this issue, his expert purports to opine on the ultimate question before the Court, concluding that Freedom Tower and Olympic Tower are "strikingly similar".  Professor Axley's inadmissible opinion on this point (¶¶ 21-24 of his declaration) should be stricken from the record, and not considered by the Court on this motion.  *See Rottlund Co., Inc. v. Pinnacle Corp.*, 2004 WL 1879983, *25 (D.Minn. Aug 20, 2004) (disregarding portion of expert affidavit where expert attempts to tell the court what result to reach because "opining generally on substantial similarity is something [an expert] clearly may not do"); *U.S. v. Scop*, 846 F.2d 135, 139 (2d Cir. 1988) (error not to exclude expert's testimony stating ultimate legal conclusions).  Professor Axley is also a far cry from being an objective observer as he has been widely quoted in published articles advocating this lawsuit and was admittedly Shine's sounding board at Yale with respect to Olympic Tower.

9.      **Shine Offers No Explanation As To Why Abstraction Is Not The Appropriate Test And Why Total Concept And Feel Should Govern**

Plaintiff shuns the abstraction analysis without explaining why it should not apply.  *Contrast* Init. Memo at 42, 45-50 with Opp. Memo at 32-33.   It is easy to fathom why Shine finds this appropriate test to be an anathema:  he has no "golden nugget".  But resort to total concept and feel – again without explaining why this test makes sense for architectural works – does not save Shine's claim, because that test requires a comparison of the <u>totality</u> of both works.[10]  Init. Memo at 53-57.   Total concept and feel is not a license for plaintiff to arbitrarily select and amalgamate certain individual elements in one work and compare that imagined amalgam to a similarly hypothetical and truncated version of another work.  Init. Memo at 55-57.  Shine cannot remove the word "total" from the total concept and feel analysis.

10.      **Shine Totally Fails To Compare The Two Works As A Whole**

It is hardly surprising that, notwithstanding his wholesale adoption of total concept and feel, Shine annexed only a single visual comparison of the two works as a whole to his complaint (and a misleading one at that, as discussed below), focusing instead on comparisons of individual features. This may be due in part to the fact that Shine never actually created an image or model of the entirety of his "building" showing all of its claimed features, but comparison of his model as a so-called "coordinating drawing" (Shine Decl., ¶ 14; Durschinger Aff't, Ex. G) and the large model of Freedom Tower (Durschinger Aff't, Ex. O) at the appropriate scale and orientation,[11] shows the

---

[10]   And while total concept and feel (as well as other tests that examine non-literal copying) allows for the possibility that a combination of unprotectible elements may be protectible and infringed, as the Second Circuit emphasized in *Tufenkian,* even if the overall look and feel is the same, the Court must ascertain <u>why</u>: are the similarities due to original expression or are they the product of the unprotected elements?  Init. Memo at 54-55.  Further, since Shine does not dispute that the "more discerning" test can be applied here (Opp. Memo at 28), the unprotectible elements must be excluded from consideration on that basis as well (Init. Memo at 40-41 n. 21).

[11]   In order to present the most balanced comparisons possible in the absence of a scale for Shine's works, defendants have used the site plan scale (Shine Decl., Ex. B, p. 2) to extrapolate what the approximate dimensions of Olympic Tower might be (Durschinger Reply Aff't, ¶ 3).

primary reason why he avoided such a direct comparison:

  





OLYMPIC TOWER
LOOKING NORTH

FREEDOM TOWER
LOOKING NORTH

OLYMPIC TOWER
LOOKING WEST

FREEDOM TOWER
LOOKING WEST

*See* Durschinger Reply Aff't, Exs. A and B. This overall visual comparison, mandated by the total concept and feel test that Shine claims must govern, starkly reveals just how devoid of merit is Shine's claim of copyright infringement of Olympic Tower.

> **11.   Shine Never Actually Addresses The Expression Of The Identified And Allegedly Substantially Similar Features In Freedom Tower**

Another striking aspect of plaintiff's opposing papers is the almost total absence of any description of Freedom Tower.  To the extent its design is discussed at all, it is only in the context of features it supposedly shares with Olympic Tower.  Shine Decl., ¶ 21; Axley Decl., ¶ 22; Opp. Memo at 9-10, 25.  Shine and Professor Axley identify purportedly similar features in the two buildings by name, but with a few minor exceptions, they only *describe* those features as they appear in the Olympic Tower materials, not as they appear in Freedom Tower.  This omission is quite remarkable since the crux of an infringement claim is the substantial similarity analysis, and here plaintiff makes no effort to explain how the common concepts allegedly present in both works are expressed similarly.  Of the 23 pages of argument in plaintiff's opposition memorandum, not a single page is devoted to *application* of the total concept and feel test.  Rather, Shine relies exclusively on the five photographic comparisons annexed to the complaint as alleged proof of substantial similarity, saying "[t]he pictures speak for themselves".  Opp. Memo at 27; Comp., Ex. G., pgs. 1-5.

> **12.   Shine Tries to Manufacture Similarity By Manipulating His Comparisons**

In this case, these pictures most certainly do ***not*** speak for themselves, although they bespeak volumes about Shine's disingenuity and deception:  the comparative photographs Shine offers have been deliberately manipulated in order to create an impression of superficial similarity where none exists.  None of these manipulations were disclosed by Shine in his papers.

First, all five photographs have been manipulated in terms of scale.  For example, the large diamond shapes created by the diagrid in Freedom Tower span 15 floors, while in Olympic Tower they span 20 floors (Durschinger Aff't, ¶ 39), so in order to make them appear similar in size, Shine

had either to enlarge the Freedom Tower images or shrink the Olympic Tower images without regard to equivalent scales, and that is precisely what he did.

Second, the overall size of the two buildings is very different, so the first four comparisons have been carefully edited to show only parts of the buildings in order to avoid the size differential becoming apparent.  In one of those partial comparisons, Shine even includes an upside-down image of Freedom Tower to enhance his comparison.  Comp., Ex. G, p. 2.  (In the final comparison (Comp., Ex. G, p. 5), the image of Olympic Tower likely has been enlarged, but plain differences in building size can be seen even with this manipulation.)

Third, to create three of his comparison photographs, Shine used a model of Olympic Tower that he now concedes he did not present at his final jury, was not annexed to his copyright registration, and upon which he now disclaims reliance.  When defendants pointed out the significant discrepancy between the number of diagonal columns or nodes shown in each of Shine's various models and drawings – *i.e.,* the floor plans and the large paper model showed six nodes, while the structural models showed seven nodes (Meier Aff't, ¶ 17) – Shine had no choice but to fess up.  He now admits that the "large structural model" he showed defendants in response to their demand to see the actual underlying models for the photographs annexed to his complaint and his copyright registration, is actually a flawed "reconstruction", built in response to defendants' request to photograph his models.  Opp. Memo at 5 n.3.  Trouble is, he made a little mistake:  it should have had six columns per side, not seven, he now says.  Shine Decl., ¶ 7 n.2; Opp. Memo at 5 n.3.  The same problem appears in the four-sided structural model of unspecified creation date, also photographed and annexed to the complaint.  Comp., Ex. B, pp. 5-6; Durschinger Aff't, Ex. I. Shine now concedes that that model was not presented at the final jury (and therefore not seen by Childs) and, more importantly for present purposes, that it is not part of his claimed design for Olympic Tower, as it was not appended to his copyright registration.  Shine Decl., ¶¶ 7-9; Opp.

Memo at 3-7, Durschinger Aff't, Ex. L.  Even though it is not part of his claimed Olympic Tower design, Shine nevertheless used it as the basis for three of the five comparisons annexed to his complaint, presumably because he thinks it looks more like Freedom Tower than the seven column model he recently "reconstructed".

Fourth, and most egregiously, Shine has doctored four of the five comparisons (Comp., Ex. G, pgs. 2-5) to show Olympic Tower twisting in a different direction than it actually twists in Shine's models.  As is readily apparent from a review of the Olympic Tower floor plans (Shine Decl., Ex. A; Shine Supp. Decl., Ex. A) and the photographs defendants took of Shine's models (Durschinger Aff't, Exs. G-I), Olympic Tower rotates or twists in a **counter-clockwise** direction, bottom to top.  Although – as noted above and in defendants' moving papers – Freedom Tower does not technically twist, the orientation of the two chamfered sides warps in a **clockwise** direction, bottom to top.  *See* Durschinger Aff't, Exs. N-S; Init. Memo at 48.  To conceal this rather critical difference, Shine apparently used a mirror image of the photographs of his actual models to create a comparison image that would show Olympic Tower twisting in a clockwise direction:





COMPLAINT                           COPYRIGHT REGISTRATION

Durschinger Reply Aff't, ¶ 14, Ex. L.  This is not simply manufacturing evidence (as Shine did in

"reconstructing" a model that no longer exists) or sloppy presentation of evidence (as Shine did by annexing an upside-down copy of an image), it is doctoring evidence in a blatant attempt to deceive the Court and the defendants.

### 13. Shine Effectively Concedes That The Alleged Similarities Are Similarities In Ideas, Not Expression

Defendants have addressed at length the lack of similarity between each aspect of these two proposed works.  Init. Memo at 48-53; Meier Aff't, ¶¶ 33-41.  In response, Shine plays semantic games to enlarge his laundry list of alleged similarities between Olympic Tower and Freedom Tower, reciting eighteen allegedly similar "elements" in them, organized into five major categories: Form, Structure, Floor Plans, Façade and Entry.  Shine Decl., ¶ 21; Opp. Memo at 9-10.[12]  As becomes crystal clear in reviewing Shine's list on his own terms as we do below, no matter how many different ways he tries to say it, Shine's particularization collapses into nothing more than the same combination of three ideas previously addressed:  a structural diagrid, a "twist", and an "undulating" curtain wall façade (Opp. Memo at 14, 16 and 31), and the expression of each of those three ideas in the two works is markedly different.

**Form.**  Shine alleges that both Olympic Tower and Freedom Tower "twist".  However, a building that "twists" is merely an idea, and as Shine is forced to concede, the precedents identified by Richard Meier establish that there are numerous ways that this idea can be expressed.  Meier Aff't, ¶ 27; Opp. Memo at 18.  Shine's concession that the overall shape or form of the buildings is wholly dissimilar (Shine Decl., ¶ 21(a)) is only one aspect of the dissimilarity.  Shine also claims that the buildings both twist "in only one direction" (Shine Decl., ¶ 21(b)), but as discussed above, to the extent Freedom Tower can be said to "twist" at all, it does so in the *opposite* direction from Olympic

---

[12]  Those elements are arranged in different subsets elsewhere in his papers, and described in different ways. *See* Opp. Memo at 19, 20, 29.  Shine's expert proffers a list of five elements that *he* believes constitute a unique combination.  Axley Decl., ¶ 22; Opp. Memo at 31.  (It is revealing indeed that plaintiff and his own expert cannot even agree upon which combination allegedly has been copied!)

Tower, whose floor plates rotate counter-clockwise.  And while Olympic Tower twists through 90 degrees (Axley Decl., ¶ 9), the angle of alteration of Freedom Tower's warped faces is only 30 degrees (Meier Aff't, ¶ 34).  So there is and can be no similarity in "twist" beyond the idea of it.

The only other elements of "form" that Shine identifies are the facts that each building tapers and has an "elongated saw-tooth edge" when viewed in profile.  Shine Decl., ¶ 21(c) and (d); Axley Decl., ¶ 18.  The Court can take judicial notice that many tall towers taper, although they taper in very different ways, *e.g.*, the Empire State Building and the Chrysler Building.  More to the point, Freedom Tower and Olympic Tower taper in different ways, as a comparison of the floor plates as the building rises demonstrates. *See infra,* at 19; Durschinger Reply Aff't, Exs. D-G; *see also* Meier Aff't, ¶¶ 33-34 (describing resultant "hunched" form).  Also significant is the fact that Freedom Tower ends in an open structure with wind turbines topped by a spire, while Olympic Tower has a blunt and undistinguished top.  Meier Aff't, ¶ 36.

As to the "saw-tooth edge", by definition, the "edges" of Olympic Tower and Freedom Tower must be different, since on Olympic Tower each corner is an intersection of two twisting sides that have a "woven" façade, whereas on Freedom Tower each corner is an intersection of one flat side and one warped side that has a "faceted" façade.  Although it is difficult to perceive the "saw-tooth edge" Shine describes (none of his models or drawings show this feature clearly), a comparison of the edges of the two buildings demonstrates their clear dissimilarities.  First of all, the buildings' respective corners are "turned" differently, as Olympic Tower's corner is inset, while Freedom Tower's is not:



OLYMPIC TOWER CORNER DETAIL          FREEDOM TOWER CORNER DETAIL

Durschinger Reply Aff't, Ex. L.  More importantly, a comparison of the edges in the parties' respective

models shows that because of the differing patterns in the façade, the corners must differ:



OLYMPIC TOWER EDGE          FREEDOM TOWER EDGE

*Id.*

   **Floor Plans.**  The above difference in overall form of the two designs is most readily

apparent by comparing the respective floor plans, which have a different shape and size at each

corresponding level.  *See* Meier Aff't, ¶ 33-34.  For example, the plans near the bottom of each

building differ because Olympic Tower begins with a square base and Freedom Tower begins with

a parallelogram of much greater size:




OLYMPIC TOWER                    FREEDOM TOWER
GROUND FLOOR                     GROUND FLOOR

Durschinger Reply Aff't, Ex. D.

The floor plans also differ radically on succeeding levels, as seen in the comparisons

presented in the accompanying Durschinger Reply Aff't, Ex. E.  The difference is especially stark

on certain higher floors because the occupied floors in Freedom Tower end approximately at the

70th floor, while Olympic Tower has approximately 90 occupied floors. Meier Aff't, ¶ 33;

Durschinger Aff't, ¶ 39.  Although Olympic Tower would have many more floors of occupied

space, it is a much narrower building and the amount of space on each floor would be considerably

smaller than in Freedom Tower, and arranged differently.

This difference in floor plans is particularly significant given that the definition of architectural

works specifically includes the "arrangement of spaces".  17 U.S.C. § 101. Shine's list of elements

completely ignores the interior architecture of the two buildings, focusing almost entirely on the middle

sections of the buildings' respective exteriors, precisely because of the significant differences in even the limited articulation of interior spaces in Olympic Tower on the one hand and Freedom Tower on the other. Other than the fact that both have elevators and stairwells, they bear almost no similarity in this regard: for example, on the ground floor Freedom Tower has 54 elevators and 5 stairwells, whereas Olympic Tower has 24 elevators and 2 stairwells, and all of these elements are arranged differently. [13] *See* ground floor comparison *supra* at 20; *see also* Meier Aff't, ¶ 33 (noting that Olympic Tower's rotation around off-center core produced "irregular" interior spaces).

Shine strains mightily to find some similarity, however trivial, in these floor plans. First, he points to the prosaic fact that both buildings' floor plates "are four-sided and straight-edged" and have opposite sides that are parallel. Shine Decl., ¶ 21(i) and (j). This is a geometric description that includes every shape of parallelogram that can be imagined (including squares and rectangles), and thus easily covers not only the Freedom Tower and Olympic Tower floor plates, but those of the virtually every tall building in Manhattan. Second, he claims that the "area of the floor plan" reduces equally as the building rises and that this reduction is the "sole generator of the overall building form". Shine Decl., ¶ 21 (k) and (l). Apart from the fact that this is just another way of saying that the buildings each taper, in fact, the area of the corresponding floor plans for Olympic Tower and Freedom Tower are completely different because, *inter alia*, the different placement, configuration and size of the elevator and service cores of each create an entirely dissimilar arrangement of interior spaces within each building.

**Entry.** Comparison of the entrances in the respective works reveals no similarities beyond the fact that each building *has* entrances. Olympic Tower has entrances on two sides, which are difficult to

---

[13]   Shine now claims that the floor plans he annexed to his complaint and copyright registration are not the ones he showed at his final review in 1999 and therefore should be ignored; in their stead, a new set of floor plans which appear to show different locations for stairwells and other interior elements should control. Shine Supp. Decl., ¶ 3. Because there is no similarity between the interior elements of Freedom Tower and those of ***either*** version, these differences are immaterial on this motion, beyond demonstrating that Shine himself cannot make

see from the pictures of his models but are intended to be, in Shine's words, "set into the base of the three central diamonds, in which the curtain wall has been pulled back to allow the structure of the Shine Grid to be revealed for a half-length of the diamond", with "canopies over the entrance".[14]  Shine Decl., ¶ 15.  Freedom Tower has no canopies.  It is ringed on three sides by a continuous open arcade formed by the structural diagrid and a separate inset glass lobby wall.  The arcade provides uninterrupted protection from the elements for pedestrians and visitors around the entire perimeter of the building, as well as at the building entrance locations on each of its three sides.   Durschinger Aff't, ¶ 39.  While both buildings can be said to incorporate the *idea* of "expos[ing] the structure at the entry" (Shine Decl., ¶ 21(r)), the structures are exposed in wholly different ways, to entirely different effect:

 

OLYMPIC TOWER ENTRANCE                    FREEDOM TOWER ENTRANCE

Durschinger Reply Aff't, Ex. H.

**Structure.**   As discussed, the so-called "Shine Grid" is not original and, in any event, Freedom Tower's diagrid is expressed quite differently.  To begin with, since Shine admits that

---

up his mind as to what he wants to claim constitutes his design for a building.

[14]  The ground floor section in the new materials annexed to Shine's declaration reveals that the orientation of the entrance bays on two sides of Shine's building and their alignment are totally unlike the number, design, and alignment of the entrances on Freedom Tower.  Shine Decl., Ex. B, p. 3.

Freedom Tower and Olympic Tower do not twist in the same manner or at the same rate, the application of a structural diagrid to each – whether the so-called Shine Grid or one like the Freedom Tower's diagrid – must, by definition, be dissimilar.  Init. Memo at 48-49(identifying, *inter alia*, proportions; shape; number of structural nodes; and number of columns as differences between Olympic Tower and Freedom Tower diagrids); *see also* Meier Aff't, ¶¶ 37-38.

In his continuing semantic effort to morph his three claimed common elements in the buildings into a protectible combination, Shine breaks the grid into three components:  (i) the claimed lack of vertical support in the grid; (ii) the grid consisting of diamonds meeting tip to center, aligned horizontally and connecting to floor plates at structural nodes; and (iii) the diamonds forming the grid meeting at the base at a point or node.  Shine Decl., ¶ 21(e)-(h).  A grid composed of crossing diagonal columns by definition *must* create diamond shapes that meet "tip to center" (they also meet tip to tip and center to center) and must be aligned both horizontally and vertically.[15]   Likewise, that the steel columns comprising the diagrid are connected to the floor plates at nodes is dictated by structural efficiency.  *See* Meier Aff't, Exs. E-F (other buildings whose diagrids end at structural nodes).

**Façade.**  Professor Axley identifies the façade as the aspect of Freedom Tower most similar to that of Olympic Tower, because both have "window designs which undulate so as to protrude outward at the midpoints".  Axley Decl., ¶ 23.  (Numerous buildings might fit this definition; one obvious example is SOM's Air Force Academy Chapel.  *See* Meier Aff't, Ex. J, pp. 2-5.)  Yet Professor Axley goes on to concede that "the buildings achieve this effect differently (the window design in Freedom Tower is faceted, so the elongated diamonds are divided longitudinally, and

---

[15]   The fact that the diamonds are of uniform size and shape is due to the fact that the diagonal columns are spaced equally, as Professor Axley concedes.  Axley Decl., ¶ 10.  However, Axley's statement that the "apparently equal spacing of the opposing members was a design choice not necessitated by physical constraints" (*id.*) is either disingenuous or displays an utter lack of understanding of real world structural engineering.  Every single building or design identified by Meier as a precedent for diagrids contains a

thrust outside the diamonds, whereas Olympic Tower windows are mostly recessed ). . . ." Axley Decl., ¶ 23. This is a textbook description of a non-infringing similarity of an underlying concept, rather than of protected expression. Richard Meier has detailed this difference in expression of the façade. Meier Aff't, ¶¶ 39-40; Init. Memo at 49-50.

Further to Shine's semantic gamesmanship, he breaks down the façade into four separate elements. He repeats Axley's description of the undulation caused by the "protruding diamonds", which he, like Axley, admits is expressed differently in Freedom Tower. Shine Aff't, ¶ 21(o)-(p). As noted, he finds alleged similarity in the "undulations" of the façades, but again concedes that "Freedom Tower's undulations varies [sic] inversely to Olympic Tower, getting greater as the building rises", *i.e.* the undulation in Freedom Tower's façade begins flat at the bottom and ends with more pronounced undulation at the top, while Olympic Tower displays the opposite progression. Shine Aff't, ¶ 21(p).

Next, Shine points to the underlying structural grid of Olympic Tower as "expressed" in the curtain wall (Shine Aff't, ¶ 21(m)), but as Meier has already explained, Shine's underlying structure is exposed to the elements rather than expressed (Shine's curtain wall consists of glazing that is in-filled between structural members), which is completely unlike the Freedom Tower curtain wall. Meier Aff't, ¶ 22. Shine does not contest this description, and Axley's characterization of the windows in Olympic Tower as being "mostly recessed" confirms it. Axley Decl., ¶ 23. Even if we are to speculate that Shine's building is supposed to have a curtain wall that completely envelopes the underlying structure (which is nowhere apparent from any of his models or drawings), Shine cannot separate the expression of the grid in the curtain wall and the "subdivision" of that grid into a "proportional, symmetrical elongated diamond façade pattern" and call it a separate "element". Shine Aff't, ¶ 21(n). The proper comparison is between the pattern of the curtain wall in Olympic Tower and the one in Freedom Tower,

---

diagrid with members spaced equally. Meier Aff't, ¶ Exs. E-F.

which even a superficial review demonstrates are dissimilar.  As is clear from the images below, the patterns in the curtain walls of these two buildings are dramatically different; despite the fact that both are dominated by triangles/diamonds, Freedom Tower's glazing is not subdivided by smaller diagonals at all.





       OLYMPIC TOWER FAÇADE                         FREEDOM TOWER FAÇADE

Durschinger Reply Aff't, Ex. I.

## CONCLUSION

As graphically demonstrated by the above illustrations, the two works in issue here are a far cry from substantially similar under the total concept and feel test or any other.  Given the rudimentary nature of Shine's plans and consequent exceedingly general definition of his "elements" – whether alone or in combination – Shine essentially asks the Court to protect a

selection, order and arrangement of three ideas.  This violates the fundamental tenet of copyright law that only original expression will be protected.  Therefore, the complaint should be dismissed with prejudice and defendants should be awarded prevailing party attorneys' fees.

Dated:    New York, New York
              May 20, 2005
                                                    FLEMMING, ZULACK & WILLIAMSON, LLP


                                                    By:  /s Richard A. Williamson
                                                          Richard A. Williamson (RW-3033)
                                                    One Liberty Plaza
                                                    New York, New York  10006-1404
                                                    (212) 412-9500


                                                    DAVIS WRIGHT TREMAINE LLP


                                                    By:  /s Marcia B. Paul
                                                          Marcia B. Paul (MP-8427)
                                                    1633 Broadway, 27th Floor
                                                    New York, New York 10019-4315
                                                    (212) 489-8230

                                                    Attorneys for Defendants David M. Childs
                                                    And Skidmore, Owings & Merrill LLP

Of Counsel:

          Richard A. Williamson
          Marcia B. Paul
          Elizabeth O'Connor
          Lacy H. Koonce, III

TO:      Andrew Baum, Esq.
          DARBY & DARBY P.C.
          805 Third Avenue
          New York, New York  10022

          Attorneys for Plaintiff
          Thomas Shine